**INDIANA BELL TELEPHONE COMPANY INCORPORATED, d/b/a Ameritech Indiana, Plaintiff,**

**v.**

**SMITHVILLE TELEPHONE COMPANY, INC., et al., Defendants.**

**No. IP 98–0593–C M/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

Dec. 29, 1998.

**630**

A. David Stippler, Ameritech Indiana, Anne N. DePrez, Barnes & Thornburg, Indianapolis, IN, for Plaintiff.

Larry J. Wallace, Parr Richey Obremskey & Morton, William B. Powers, Boberschmidt & Powers, Indianapolis, IN, Stephen G. Kraskin, Kraskin Lesse & Cosson, Washington, DC, Beth H. Henkel, Deputy Attorney General, Office of the Attorney General, Indianapolis, IN, for Defendants.

### ORDER

McKINNEY, District Judge.

This matter comes before the Court on motions filed by the defendants challenging the Court's subject matter jurisdiction over the claims raised in the plaintiff's case. On September 10, 1998, defendant Indiana Utility Regulatory Commission ("IURC" or "Commission"), and five commissioners of the IURC (collectively the "State Defendants"), filed their motion arguing alternatively that:

1. The IURC's decision regarding the plaintiff's arbitration petitions was an interim decision, and not a final one under 47 U.S.C. § 252(e)(6), which means the Court has no subject matter jurisdiction under that statute;

2. Only an Indiana appellate court could have jurisdiction over an interim decision of a state agency, and because such an appeal is pending this Court should abstain from the exercise of jurisdiction; and

3. Because the State of Indiana has not consented to suit in this action and Congress did not abrogate a state's immunity with respect to intrastate communications service and rates, the 11th Amendment of the Constitution bars this action.

A similar motion to dismiss was filed by twenty-six of the twenty-seven rural telephone companies (the "LECs" or "rural LECs") named in this action by plaintiff, Indiana Bell Telephone Company, Inc., d/b/a Ameritech Indiana ("Ameritech"). In addition to the statutory grounds argued by the State Defendants, the rural LECs argue that Ameritech has failed to exhaust its administrative remedies.

Having considered the arguments and evidence presented by the parties in their briefs, the Court finds that it does not have subject matter jurisdiction over the controversy between Ameritech and the IURC, or between Ameritech and the rural LECs. For the reasons further explained herein, the Court GRANTS both of the motions to dismiss.

### I. BACKGROUND

On February 8, 1996, Congress passed the Telecommunications Act of 1996 (the "1996 Act" or the "Act") to effect comprehensive changes in the 1934 Telecommunications Act. Pub.L. 104–104, 110 Stat. 56 (codified as amended in scattered sections of Title 47, United States Code). The primary purpose of the 1996 Act "was to reduce regulation and encourage the rapid deployment of new telecommunications technology." *Reno v. American Civil Liberties Union,* 521 U.S. 844, 117 S.Ct. 2329, 2337, 138 L.Ed.2d 874 (1997). As the Supreme Court noted, the major components of the 1996 Act are designed to "promote competition in the local telephone service market, the multichannel video market, and the market for over-the-air broadcasting." *Id.* One aspect of achieving this pro-competition goal calls for telecommunications carriers to enter reciprocal compensation agreements for local calls that use each oth-

er's networks. 47 U.S.C. § 251(b)(5). Put simply,

> If a subscriber of Company A calls a subscriber of Company B, then A must share with B some of the revenue A collects from its subscriber, to compensate B for the use of its facilities.

*Illinois Bell Tel. Co. v. WorldCom Tech.*, 157 F.3d 500, 501 (7th Cir.1998).

This requirement is enforced by state agencies, such as the IURC in Indiana. *See Id.; see also Iowa Util. Bd. v. Federal Communications Commission*, 120 F.3d 753, 804 (8th Cir.1997), *cert. granted*, — U.S. —, 118 S.Ct. 879, 139 L.Ed.2d 867 (1998) (power to approve or reject agreements implies power to enforce them). The way this happens is that the two local telecommunications carriers are required to reach an agreement covering the interconnection charges used to provide "reciprocal compensation" for use of each other's facilities. That agreement is then approved by the State commission after it has been reviewed to determine its compliance with the relevant statutory and regulatory standards. A decision by the State agency approving or rejecting an agreement and implementing the 1996 Act, may be reviewed only by a federal district court. *Id.*, 47 U.S.C. § 252(e)(6).

The provisions of the 1996 Act at issue in this litigation are found in Part II—Development of Competitive Markets, in the Subchapter titled "Common Carriers." 47 U.S.C. §§ 251 and 252. Therein, Congress established certain duties and obligations for telecommunications carriers generally, 47 U.S.C. § 251(a), for local exchange carriers ("LECs"), 47 U.S.C. § 251(b), and specific additional obligations for incumbent local exchange carriers ("ILECs"), 47 U.S.C. § 251(c). An ILEC is the local exchange carrier that, with respect to a given area, provided the area's telephone exchange services as of February 8, 1996. 47 U.S.C. § 251(h)(1). The general duty of all carriers is to "interconnect directly or indirectly with facilities and equipment of other telecommunications carriers" and to install network features, functions or capabilities that comply with the guidelines and standards set forth in other provisions of the Act. 47 U.S.C. § 251(a).

The duties for the LECs include, among other things, the duty to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). This duty is at the core of the dispute between Ameritech and the rural LECs. Additional duties for ILECs include "the duty to negotiate in good faith . . . the particular terms and conditions of agreements to fulfill the duties [in § 251(b) and (c) ]." 47 U.S.C. § 251(c). Likewise, the ILEC must "provide . . . interconnection . . . at any technically feasible point" in its network, and "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory. . . ." *Id.* If the requesting telecommunications carrier asks for it, the ILEC must also provide the interconnection on an "unbundled basis." *Id.; see also Iowa Util.*, 120 F.3d at 791 (describing three duties of ILECs: interconnection, unbundled access, and resale).

In addition to imposing these obligations on the carriers, the 1996 Act also provides for an exemption from the obligations of interconnection and reciprocal compensation agreements to rural telephone companies. 47 U.S.C. § 251(f). The exemption is automatic, and it applies until the State commission conducts an inquiry to determine whether the obligations of the Act will impose an undue economic burden on the carrier, considering the technical feasibility of interconnection and the issues surrounding the need to maintain universal service. *Id.* § 251(f)(a)(B). To facilitate that inquiry, a requesting telecommunications carrier is required to give the State commission notice of its request for interconnection services, following which the commission will have 120 days in which to make its determination. *Id.* The State commission may also suspend or modify application of the requirements for rural LECs and ILECs of a certain size, if it is necessary to "avoid a significant adverse economic impact on users of telecommunications services generally," to "avoid imposing a requirement that is unduly economically burdensome," or if it is "technically infeasible." 47 U.S.C. § 251(f)(2). The suspension

or modification must be consistent with the "public interest, convenience, and necessity." *Id.* All of these determinations require an affirmative act and technical findings by the State commission before a decision may be reached.

Finally, § 252 of the Act sets forth procedures for negotiating, arbitrating and obtaining final approval of interconnection agreements. 47 U.S.C. § 252. The process begins with a bona fide request for negotiation of an interconnection agreement ("Request"). *Id.* § 252(a). If the Request is directed to a rural LEC, the State commission also should receive a notice of the Request. 47 U.S.C. § 251(f)(1)(B). If the State commission determines that the rural LEC is not exempt from § 251(c), it must then establish an implementation schedule for compliance with the request. *Id.* Only then may an agreement be reached by voluntary negotiations between the rural ILEC and any telecommunications carrier seeking interconnection or network services. *Id.* § 252(e). The State commission also may participate in the negotiations at any point, if the negotiating parties request it, and it may mediate any differences. *Id.* § 254(a).

However, if voluntary or mediated negotiations fail to produce a complete agreement within a specific period of time after the initial Request, any party may petition the State commission to "arbitrate any open issues." [1] 47 U.S.C. § 252(b). The arbitration clock starts ticking on the date of the Request for an interconnection services agreement, and arbitration may only be sought between the 135th and 160th days after that date.[2] *Id.* § 252(b). If arbitration is sought,

the State commission must fully resolve each issue presented by either party for the arbitration within nine months of the date of the initial Request for an interconnection services agreement. 47 U.S.C. § 252(b)(4). During an arbitration, the State commission must limit its review to the issues set forth in the petition and any responses thereto, although it may require the parties to submit additional information necessary to the arbitration. *Id.* § 252(b)(4). If any party refuses to negotiate, participate, or cooperate with the State commission during an arbitration, it "shall be considered as a failure to negotiate in good faith." *Id.* § 252(b)(5).

In resolving the issues raised in an arbitration, the State commission must abide by certain standards set out in § 252(c). Specifically, it must ensure that the agreement meets the requirements of § 251 and any regulations promulgated pursuant to that section, determine whether the rates set are in compliance with § 252(d), and it must set a schedule for implementation of the terms and conditions of the agreement. 47 U.S.C. § 252(c). With respect to rates, § 252(d) requires pricing for interconnection services or network elements to be "just and reasonable," and based on the cost of providing the service. *Id.* § 252(d). Prices must also be non-discriminatory and may include a reasonable profit. *Id.* In fact, the State commission may not approve the agreement unless it "provide[s] for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination" of traffic, and it is based on a reasonable approximation of the additional costs of such calls.[3] *Id.* § 252(d)(2).

---

1. Although not specifically stated in the statute, a reasonable construction is that negotiating with a rural ILEC would be governed by the implementation schedule established by the State commission when it found the ILEC no longer exempt.

2. Again, the Act does not specifically describe the interrelationship between a determination regarding a rural carriers' exempt status and the time limitations imposed on the requesting carrier for purposes of seeking arbitration. Logically, however, if a rural LEC is exempt from the duty to negotiate, then it would seem the requesting party would not be limited by the arbitration clock until after the State commission has made its determination about exemption.

3. Transport and termination of local traffic refers to the routing of calls from one telecommunications carrier to another. When a customer of one carrier makes a call to a customer of another carrier, the call is considered "traffic" that is transported over the interconnected lines of both carriers. When the call is completed, the telecommunications carrier whose customer received the call and who is considered to have "terminated" the call, typically charges the other telecommunications carrier for the cost of terminating the call. The 1996 Act imposes a duty on all carriers to establish reciprocal compensation arrangements in connection with transport and termination of local traffic. *See Iowa Util.,* 120 F.3d at 792, n. 7.

Before any interconnection agreement may be implemented or enforced, whether it was produced by negotiation or arbitration, it must be submitted for and receive approval by the State commission. 47 U.S.C. § 252(e)(1); *Iowa Util.,* 120 F.3d at 792. The State commission "shall approve or reject the agreement, with written findings as to any deficiencies." 47 U.S.C. § 252(e)(1). The 1996 Act limits the possible grounds for rejection, but also preserves the authority of the State commission to establish or enforce other requirements of State law in its review of the agreement. *Id.* § 252(e)(3). However, if not inconsistent with requirements in other sections, a State commission may consolidate proceedings under § 252 with those for several other sections of the Act to reduce the administrative burdens on all involved. *Id.* § 252(g). Those sections include § 214(e) (allowing State commission to determine if the LEC is eligible for "universal service support," which includes the need to define "service area"), § 251(f) (determining if LEC is eligible for exemptions or suspensions from the requirements of § 251) and § 253 (regarding opening local markets while preserving universal service). *Id.* Each of the named sections involve the commission's making of additional technical findings.

Once the State commission has decided to approve or reject an agreement, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement meets the requirements of § 251 of the 1996 Act.[4] *Id.* § 252(e)(6). If the "State commission fails to act to carry out its responsibility" under § 252 "in any proceeding or other matter," then the Federal Communications Commission ("FCC") "shall issue an order preempting the State commission's jurisdiction of that proceeding or matter...." *Id.* § 252(e)(5). The FCC is required to take this action within ninety days of being notified (or taking notice) of the State commis-

sion's failure, and it "shall assume the responsibility of the State commission" with respect to the proceeding or matter "and act for the State commission." *Id.* "[T]he proceeding by the [FCC as just described] and any judicial review of the [FCC's] actions shall be the exclusive remedies for a State commission's failure to act." 47 U.S.C. § 252(e)(6).

Having reviewed the statutory framework surrounding the events at issue in this litigation, the Court now turns to a brief description of those events. Ameritech is a corporation organized under the laws of Indiana, with its principal place of business in Indianapolis. It is a "telecommunications carrier," "local exchange carrier," and "incumbent local exchange carrier," as those terms are defined in the 1996 Act. By filing this action, Ameritech seeks declaratory and injunctive relief against twenty-seven rural telephone companies, the Indiana Utility Regulatory Commission ("IURC"), and the named individual commissioners of the IURC. The IURC is a "State commission" as the term is defined in the 1996 Act. The named commissioners of the IURC were sued in their official capacities, which is the same as suing the IURC itself, and these defendants will be referred to interchangeably as the "State Defendants," or the "Commission."

Defendant Smithville Telephone Company ("Smithville") is a corporation organized under the laws of Indiana and, along with the twenty-six other named rural telephone service carriers, is a "telecommunications carrier," "local exchange carrier," and "incumbent local exchange carrier" as those terms are defined in the 1996 Act. The named LEC defendants are among the type of local service providers who are required by the 1996 Act to facilitate entry of competing companies into local telephone service markets by permitting a requesting new entrant to interconnect with the ILEC's existing local net-

---

4. The Act also contains provisions for a Bell operating company to file with the State commission "a statement of the terms and conditions that such company generally offers within that State to comply with the requirements of section 251" and the regulations and standards relating thereto. 47 U.S.C. § 252(f). The State commission must review the statement and approve it if

it complies with the 1996 Act. *Id.* Such approval, however, does not relieve the Bell operating company of its duty to negotiate an agreement under § 251. *Id.* A federal district court is also given jurisdiction to review any decision regarding such statements. No such statements are involved in this matter.

work. *See Iowa Util.*, 120 F.3d at 791 (referring to the "local competition provisions" of the 1996 Act: interconnection, unbundled access, and resale). The named LECs are also considered rural telephone companies, which places them in a category of carriers that may be eligible for a continuing exemption from or suspension of the obligations of the 1996 Act. *See* 47 U.S.C. § 251(f).

The defendant rural ILECs and plaintiff Ameritech have had in place for many years certain extended area service ("EAS") agreements, under which they have established routes between each others' exchanges that allow for extended service areas for their subscribers. Compl. ¶¶ 40–41. "EAS is a 'telephone service permitting persons in a given exchange to place calls and/or receive calls from one or more exchanges at monthly flat or measured rates without being assessed message toll charges for each message.'" State Defs' Brf. at 7 (citing 170 Ind. Admin. Code § 7–4–2(a)). Its effect is to enlarge the toll-free calling zone for subscribers to include neighboring exchanges. The EAS agreements between Ameritech and the rural LECs are not separate agreements, but part of a bundled exchange package. Compl. ¶ 40.

These agreements have governed the interconnection of the companies' networks and included provisions for compensation for traffic flow between the exchanges for twenty-five years. Compl. ¶ 41. According to Ameritech, the compensation structures in place are not balanced and result in a subsidy by Ameritech to the defendant rural ILECs. Compl. ¶ 42. The IURC has acknowledged that the existing EAS agreements "do not involve competitive circumstances." Compl. Ex. A, April 1, 1998 Order at 17. Nor are they "compatible with terms and conditions which could be offered for purposes of resale, or other types of interconnection agreements." *Id.* As a result, the Commission observed, the current EAS agreements "must be replaced with agreements which are compatible for such purposes at some point in the future." *Id.*

In an effort to make the future now, and invoking § 252 of the 1996 Act, Ameritech sent "Bona Fide Requests" in May and June of 1997 to twenty-one of the named rural LECs for purposes of negotiating an interconnection agreement to replace the current EAS agreements.[5] In the requests, Ameritech notified the rural LECs that it was terminating the existing EAS agreements within ninety days, which was more notice than required by the terms of the current agreements. Accompanying each request was a proposed agreement for interconnection that contained "reciprocal compensation" provisions as required under § 251 of the 1996 Act. Believing they were eligible for exemption or suspension from the requirements of § 251(c), the defendant LECs refused to negotiate or enter into substantive discussions with Ameritech regarding the proposed agreements. Compl. ¶¶ 44–46; Plf's Tender of Stippler Aff., Tab E, Ex. 1 at 3; Ex. 4, Joinder of Indiana Exchange Carrier Association.

Shortly after receipt of its Request, Smithville filed a petition with the IURC asking, among other things, for an investigation into the applicability of the 1996 Act to EAS agreements. Plf's Tab E, Ex. 1, Petition filed Jun. 25, 1997. In July, Smithville filed a motion for the IURC to preserve the "status quo" during pendency of the Smithville investigation, so that the EAS agreements would not be unilaterally terminated by Ameritech. *Id.*, Ex. 3. The IURC granted the July motion. *Id.*, Ex. 5, Order of August 27, 1997.

Despite that ruling, Ameritech understood the arbitration window corresponding to its Requests to be ending on November 6, 1997, and on November 5, 1997, Ameritech filed petitions with the Commission for arbitration of all open issues with the ILECs. Compl. ¶ 47. According to Ameritech, the Commission's own guidelines for handling such petitions required a referral to an arbitrator, who must establish a schedule within fifteen days of the referral by which to conduct hearings and prepare a final report. Compl. ¶ 48. Instead of following this procedure,

---

5. No mention is made in the complaint about whether Ameritech also sent the required statuto-ry notices of such requests to the IURC so that it could begin the exemption determinations.

the Commission entertained and considered motions to dismiss from the LECs, and consolidated the arbitration petitions with the earlier petition from Smithville addressing the potential restructuring of EAS arrangements through a Commission investigation. Compl. Ex. A, Order at 4–5. According to the IURC, the motions to dismiss crystallized the issues between the Smithville and the Ameritech arbitration petition cases, and consolidation was granted on April 1, 1998. Compl. Ex. A, Order at 5.

Also on that date, the IURC issued an order that dismissed all of Ameritech's arbitration petitions. Compl. ¶ 49, Ex. A, April 1, 1998 Order. Ameritech argues that in doing so, the Commission "impliedly approved and continued in force indefinitely the pre–1996 Act EAS agreements." Characterizing this action as a "determination" under § 252 by the IURC, Ameritech seeks this Court's review of the decision to dismiss the arbitration petitions pursuant to 47 U.S.C. § 252(e)(6). Ameritech argues that the April 1, 1998, orders constituted an approval of the existing EAS agreements, raising the issue of whether these agreements comply with the 1996 Act requirements for interconnection agreements. Consequently, Ameritech seeks declaratory and injunctive relief from the effect of these orders. Likewise, the plaintiff argues that the April 1, 1998, orders were arbitrary and capricious, abuses of discretion, not in compliance with § 252 requirements, and not supported by the record. Compl. Count II. For these reasons, also, Ameritech claims entitlement to the same relief.

Finally, Ameritech argues that the defendant LECs were required to enter negotiations and establish reciprocal compensation arrangements with Ameritech, but they have refused to do so. Their refusal has caused Ameritech to suffer damage, which will continue until the defendant LECs fulfill their duties under the 1996 Act. Compl. Count III. For this harm, Ameritech seeks both damages and injunctive relief against the LEC defendants. With this brief review of the relevant portions of the statute and the facts, the Court now turns to an analysis of the two pending motions to dismiss.

## II. DISCUSSION

### A. Rule 12(b)(1) Standards

 Under Rule 12, a party may file a motion based on lack of subject matter jurisdiction over the claim at any time. Fed. R.Civ.P. 12(b)(1). In determining whether to grant such a motion, a district court "must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor." *United Transportation Union v. Gateway Western Railway Co.,* 78 F.3d 1208, 1210 (7th Cir.1996) (citing *Rueth v. U.S. EPA,* 13 F.3d 227, 229 (7th Cir.1993)). If, however, the motion challenges the factual basis for jurisdiction, the Court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co. v. F.D.I.C.,* 999 F.2d 188, 191 (7th Cir.1993); *see also United Transportation Union,* 78 F.3d at 1210.

 When considering the evidence presented in support of or opposition to allegations of jurisdictional facts, the court may hold an evidentiary hearing, if requested, or employ any other "rational mode of inquiry." *Lumpkin v. United States,* 791 F.Supp. 747, 749 (N.D.Ill.1992) (citing *Barnhart v. United States,* 884 F.2d 295, 296 (7th Cir.1989), *cert. denied,* 495 U.S. 957, 110 S.Ct. 2561, 109 L.Ed.2d 743 (1990)). The court may weigh the evidence and resolve factual disputes to satisfy itself that it has jurisdiction over the subject matter. *Id.* "There is no presumption of truthfulness to the plaintiff's allegations." *Osborn v. United States,* 918 F.2d 724, 730 (8th Cir.1990). When material facts are in dispute, the party asserting jurisdiction (usually the plaintiff) bears the burden of establishing that all jurisdictional requirements have been met. *Selcke v. New England Ins. Co.,* 2 F.3d 790, 792 (7th Cir.1993); *Kontos v. United States Dept. of Labor,* 826 F.2d 573, 576 (7th Cir.1987); *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir. 1979).

### B. Statutory Analysis

 When interpreting a federal statute, the Court's purpose is to discern Con-

gress' intent, which is the "ultimate touchstone." *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 138, 111 S.Ct. 478, 112 L.Ed.2d 474, (1990). To accomplish this, the Court must look "not only [to] the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). Consequently, it is important that no provision be taken out of context in a way that would disrupt the statutory scheme and frustrate the legislative purpose. The statutory scheme here is designed "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." *Iowa Util.,* 120 F.3d at 791–92 (quoting from the Act's purpose statement). It creates a comprehensive framework for developing competitive markets in the telecommunications industry. *See* 47 U.S.C. *ch. 5,* subch. II, Pt. II (encompassing 47 U.S.C. §§ 251–256).

Included within the statutory framework are provisions that apportion enforcement responsibilities between the State administrative agencies and the federal district courts, with the administrative agencies bearing initial responsibility for approving and enforcing agreements, subject to review by the district court. In fact, § 252(e)(4) makes clear that state courts have no jurisdiction to review the action of a State commission approving or rejecting an interconnection agreement reached pursuant to § 252. The Eighth Circuit, in reviewing this framework, found that Congress also explicitly intended for state commissions, not the FCC, to have authority over the rates involved in implementation of the local competition provisions and related intrastate telecommunications services. *See Iowa Util.,* 120 F.3d at 796. In *Iowa Util.,* the court considered issues from a number of consolidated cases brought by ILECs all over the country after release of the August 8, 1996, FCC First Report and Order, which contained findings and rules pertaining to the local competition provisions of the Act. *Id.* 120 F.3d at 792. With but a few exceptions, the *Iowa* court ruled that the FCC had ex-

ceeded its jurisdiction when it made rules dealing with intrastate rates for the transport and termination of local traffic. *Id.*

Again, in § 252(e)(6), Congress provided for review of a State commission's determination under that section in "an appropriate Federal district court." 47 U.S.C. § 252(e)(6). Such review is presumed to be the exclusive means of challenging state commission determinations under § 252. *See Iowa Util.,* 120 F.3d at 803–04. At the same time, Congress recognized the value of expertise and experience provided by State administrative agencies in "various technical matters related to intrastate telecommunications...." *U.S. West Comm., Inc. v. Hix,* 986 F.Supp. 13, 17 (D.Colo.1997). Thus, the statute is structured so that state agencies have primary authority to make the initial determinations regarding the technical aspects of the interconnection agreements, while the federal courts "create a uniform body of federal law" by reviewing those determinations in light of the 1996 Act. *See id.; see also Iowa Util.,* 120 F.3d at 804.

For reasons that have not been made fully known to the Court, Ameritech has chosen to sidestep this statutory framework for applying the 1996 Act's mandates to interconnection activities between LECs, and has sought early judicial review of the IURC's decisions. This tactic will not work for several reasons. First, the Court lacks subject matter jurisdiction under the provisions of the Act when the state agency has yet to take final action. Second, the Act itself provides an adequate remedy for a situation in which a state commission refuses to undertake its statutory duties. Third, and related to the first two, Ameritech has failed to exhaust its administrative remedies. A fourth reason offered by the State Defendants, is that the action is barred by Eleventh Amendment sovereign immunity.

██ That argument must fail. The sovereign immunity claim has been presented unsuccessfully in numerous other cases under § 252(e)(6), with most courts finding that when a State commission agrees to participate in the process of developing and approving interconnection agreements, it has con-

structively waived its sovereign immunity. *See Indiana Bell Telephone Co., Inc. d/b/a Ameritech Indiana v. McCarty*, IP 97–0662–C–B/S, at 13 (S.D.Ind. Jun. 25, 1998) (citing *Port Authority v. Feeney*, 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990)); *see also Michigan Bell Tel. Co. v. MFS Intelenet of Michigan, Inc.*, 16 F.Supp.2d 817, 825–26 (W.D.Mich.1998) (collecting cases); *MCI Telecommunications Corp. v. BellSouth Telecommunications, Inc.*, 9 F.Supp.2d 766, 770 (E.D.Ky.1998); *U.S. West v. Public Service Comm. of Utah*, 991 F.Supp. 1299 (D.Utah 1998); *U.S. West v. TCG Seattle*, 971 F.Supp. 1365 (W.D.Wash.1997); *MCI Telecommunications Corp. v. Illinois Bell Telephone Co. d/b/a Ameritech Illinois, Inc.*, 1998 WL 156678, \*7 (N.D.Ill.1998); *but see Wisconsin Bell, Inc. d/b/a Ameritech Wis. v. Public Service Comm. of Wis.*, 1998 WL 832315, \*8 (W.D.Wis. Nov.25, 1998) (finding no constructive waiver). Consequently, unless the IURC is deemed to have refused to participate in the process for approving interconnection agreements, the State Defendants' sovereign immunity argument cannot prevail.

The Court now turns to a brief review of each of the other three arguments against continuing to exercise jurisdiction over this matter.

### C. Lack of Final Action

 More persuasive are the arguments that the Court lacks subject matter jurisdiction because there has been no final, reviewable agency action. To determine if the IURC's action was final, the Court must discern whether "the agency has completed its decisionmaking process." *Franklin v. Massachusetts*, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992); *see also Western Ill. Home Health Care, Inc. v. Herman*, 150 F.3d 659, 662 (7th Cir.1998). The "decision" Ameritech wants this Court to review is not the type of decision Congress had in mind when it designed the structure for de-

termining whether an interconnection agreement complies with the Act. Instead, it is a decision to postpone a final determination on the merits of the proposed interconnection agreements until the IURC can make several preliminary findings. At a minimum, the matter is premature because the IURC consolidated its consideration of the proposed interconnection agreements with an ongoing investigation into whether the reciprocal compensation requirements of § 251(b) should apply to EAS agreements with rural LECs in Indiana.[6] It is also premature because the IURC has yet to conduct an inquiry or make a determination about whether the automatic exemption allowed to rural LECs should be removed, or whether the rural LECs in this action should be granted a suspension of the obligations under § 251(b) and (c) because of a need to preserve universal service. For these reasons, the Court concludes that the agency has not completed its decisionmaking process.

At most, the situation could be viewed as one in which the State commission has failed or refused to carry out its responsibilities under § 252, which means that the FCC may act in the state agency's stead. 47 U.S.C. § 252(e)(5). Once the FCC has taken final action, its decision would be reviewable by a federal court of appeals. *See* 28 U.S.C. § 2342(1) (1994) and 47 U.S.C. § 402(a) (1994). According to the statute, if the State commission fails to participate in the statutory scheme for resolving these disputes, the requesting party's exclusive remedy is to notify the FCC and pursue judicial review of the federal agency's decision. 47 U.S.C. § 252(e)(5). This theory will be addressed in sub-part D.

With respect to the issue of prematurity, the Court notes that the IURC has consolidated the arbitration petitions with the earlier case brought by Smithville that sought clarification of whether EAS is a local service

---

**6.** In addition to Smithville Telephone, who originally petitioned the IURC for an investigation of the applicability of the 1996 Act to EAS arrangements and to the rural LECs generally, the Commission has allowed the joinder of the Indiana Exchange Carrier Affiliation ("INECA"), a non-profit organization that represents the interests of thirty-four independent telephone companies

throughout the state. Plf's Tab E, Exs. 3, Petition to Intervene, 5, Order of Aug. 27, 1997 at 4. Also joining in the Smithville Telephone petition before the IURC are Northwestern Indiana Telephone Co., Inc., Plf's Tab E, Ex. 2, Intervening Petition, and the Camden Telephone Company, Inc. d/b/a TDS Telecom, *et al*, Tab E, Ex. 17, Petition to Intervene.

that is subject to § 251 requirements. Compl. Ex. A, April 1, 1998 Order at 5. In doing so, the Commission recognized the relationship between the Smithville petition for an investigation of that question and the Ameritech petitions for arbitration, both of which were products of an earlier ruling by the IURC dated June 21, 1996. *Id.* In that ruling, the IURC had considered the "continuing vitality of the agreements by which current EAS arrangements are governed between incumbent local exchange carriers," and concluded that they should be maintained for a reasonable period of time until they are replaced by new agreements. *Id.* at 4. At the least, the current EAS agreements were to continue until after the FCC promulgated new rules under the 1996 Act. *Id.* Those rules were expected to clarify, among other things, the relationship between EAS arrangements and the interconnection agreements mandated by § 251 of the Act. *Id.;* Plf's Tab E, Ex. 5, Order of Aug. 27, 1997 at 3.

They did not. When the FCC issued its new rules, it did not reach a conclusion about EAS arrangements, leaving that issue to the State commissions to sort out. *Id.* at 4. As noted above, many of the rules the FCC made with respect to intrastate charges have been vacated by the Eighth Circuit. *Iowa Util.,* 120 F.3d at 800. For this reason, and because Smithville had received a notice of termination and a Request for negotiations from Ameritech, it sought guidance regarding the potential restructuring of EAS agreements through an IURC investigation. *Id.* After asking for an investigation, and out of concern that Ameritech would actually terminate the current EAS agreements, Smithville filed a motion to preserve the status quo on July 29, 1997. Plf's Tab E, Ex. 3. The IURC granted that motion on August 27, 1997, in an order that acknowledged the FCC had "reserved" the question of EAS agreements for the states, and noting the amount of time needed for the Commission to complete its investigation. *Id.,* Ex. 5.

Before this Court can determine whether any of the IURC's decisions constitute a final action on the part of the state commission, it must review the content of the relevant orders. In granting the LECs' motion and preserving the status quo, the IURC stated that:

> The Parties to this Cause are directed to maintain the status quo of all aspects of the connecting carrier arrangements associated with the provision of current extended area service (EAS) *during the pendency of this Cause.*

Plf's Tab E, Ex. 5, Order dated Aug. 27, 1997, at 4 (emphasis added). The cause to which the order referred is the Smithville petition, to which the plaintiff's arbitration petitions now have been joined. The August 27, 1997, order also declared that:

> Ameritech shall not take *unilateral action* to disrupt any aspect of the current EAS arrangements during the pendency of this matter with Petitioner or with any EAS arrangements it might presently have with any of the INECA member companies.

*Id.* (emphasis added).

Less than two months later, Ameritech asked each of the rural LECs again to review the previously-proposed interconnection agreements and begin discussions about possible areas of agreement. Getting no response to this request, Ameritech sent a notice to the IURC that it intended to file petitions for arbitration because of the unresolved issues between itself and the rural LECs. Plf's Tab E, Ex. 9, Letter Dated Oct. 24, 1997. Although it acknowledged the parties' disagreement about the applicability of the 1996 Act to the EAS agreements, Ameritech stated it would file a petition for arbitration on or about November 5, 1997. *Id.*

Ameritech filed twenty-one separate petitions for arbitration with the IURC on November 5, 1997, which created twenty-one separate cases that were subsequently consolidated into one cause and then consolidated again with the Smithville petition. On December 1, 1997, all twenty-one LECs filed motions to dismiss Ameritech's petitions, which dismissals form the alleged basis for the action before this Court. In its April 1, 1998, dismissal orders, the IURC observed that both Ameritech and the rural LECs seek a determination of whether the EAS agreements are subject to the 1996 Act. They just propose different routes. Smithville

seeks a determination through Commission investigation pursuant to state law, while Ameritech wants the issue addressed through arbitration pursuant to federal law. A core issue common to both petitions is a determination of what types of traffic will be subject to the federal mandate of reciprocal compensation agreements. Compl. Ex. A, Order at 8.

In summarizing the parties' positions with respect to the motions to dismiss, the IURC noted that Smithville argued the possibility that the IURC would define EAS so that it is not subject to the reciprocal compensation agreement requirements of § 251(b)(5) of the Act, but such a decision would involve policy-making that is the exclusive province of the IURC. *Id.* Without the IURC's policy making, Smithville asserted, the public interest may not be served. *Id.* Smithville cited the Eighth Circuit case for the proposition that the 1996 Act did not rob state commissions of their authority to determine which pre-existing interconnection agreements must be submitted for approval under § 252(a)(1) of the Act. Compl., Ex. A, Order at 9; *see Iowa Util.*, 120 F.3d at 804. Alternatively, Smithville argued that, assuming for purposes of the motion to dismiss the EAS agreement between it and Ameritech was subject to the reciprocal compensation requirements, the "rigid procedures governing negotiation and arbitration contained in section 252 of the Act do not apply to Smithville or the other smaller LECs in the state." *Id.*, Order at 10. This is because they are exempted from the requirements of the act, or would qualify for a suspension or at least a modification of same. *Id.*

Finally, Smithville noted that the pending case for investigation by the IURC to determine the 1996 Act's applicability to EAS agreements will address the issues Ameritech seeks to resolve by the arbitrations. *Id.* The IURC's role with respect to EAS agreements, Smithville argued, is to "ensure the ability of the affected consumers to continue to have beneficial expanded calling scope services while maintaining rational rates...." *Id.* at 11. Noting the IURC's public interest objective, Smithville stated that Ameritech should not be allowed to unilaterally resolve the status of EAS agreements based on its own agenda through the arbitration mechanism of the Act. *Id.* The IURC agreed with most of what Smithville had argued.

Ameritech argued to the IURC that three of Smithville's four arguments were outside the scope of the arbitration petitions, so they were issues the IURC could not take up. *Id.* at 12. According to Ameritech, the three irrelevant arguments were Smithville's attack on the arbitration petitions as being "an obvious effort to side-step" the status quo order; its claim that certain policy issues cannot be resolved by arbitration; and its assertion that resolving the arbitration petitions is dependent on certain findings by the IURC regarding the applicability of the 1996 Act to EAS traffic. *Id.* Consequently, Ameritech only addressed one of Smithville's arguments. The fourth, and only relevant argument proffered by Smithville, according to Ameritech, was that § 252 does not apply to Ameritech's petitions at all. *Id.*

By framing the issues this way during the agency proceedings, Ameritech fore-shadowed the outcome. If the IURC had to limit itself to resolving only the issues raised by Ameritech's arbitration petitions, then. it would have to set those petitions aside while it made the necessary preliminary findings. From a review of the IURC's order it is clear that the agency felt compelled to make those findings before it could decide if the proposed interconnection agreements were subject to, or in compliance with, the 1996 Act.

The Court's interpretation of the 1996 Act as it relates to interconnection agreements with rural LECs is consistent with the agency's and Smithville's. Congress has provided a presumptive exemption from the § 251 requirements for a rural LEC until after the state commission determines that a given carrier is capable of meeting those requirements. Once that determination is made, and if the Act is to be applied to a rural LEC, the state commission must decide on a schedule for implementing the statutory requirements. Moreover, when a rural LEC has provided interconnection only in a bundled manner, the parties have no basis for determining a "just and reasonable rate for interconnection" that is based in part on the

separate cost of providing such a service. *See* 47 U.S.C. § 252(d)(1)(A). Likewise, the issue of maintaining universal service at affordable rates may need to be addressed in circumstances with rural and small LECs. These are all determinations that are within the exclusive jurisdiction of the state commission, and the IURC was correct in recognizing the need for investigating these issues before addressing the arbitration petitions.

The 1996 Act specifically allows the state commission to devise an implementation schedule for the requirements of the Act that it finds are applicable to a rural LEC. 47 U.S.C. § 251(f)(1)(B). This is because the state commission is in the best position to determine how long the necessary investigations would take.[7] Based on the April 1, 1998, orders it appears that the IURC was attempting to stop any sort of statutory clock while it determined all of the preliminary issues and established a reasonable procedure and schedule for compliance with the Act, if necessary. Ameritech cannot involve the Court in this preliminary stage of the administrative proceedings. One of the unpublished opinions included in Ameritech's filings demonstrated this point. During a pretrial conference, the judge discerned that the state commission had not taken any final action and promptly dismissed the case. Plf's Tender of Decisions, Tab E, *GTE Southwest, Inc. v. Wood*, CA M–97–003 at 3 (S.D.Tex. Mar. 13, 1997). In this Texas case, the court refused to act because the interconnection agreement at issue had not yet been approved or rejected by the state commission, even though the LEC had already begun setting up interconnection interfaces in compliance with a deadline in the agreement. *Id.* The court dismissed the case "without prejudice" because it was premature. The same result is warranted here.

### D. Refusal to Act

Ameritech argues, however, that its petitions are governed by federal law, and the 1996 Act does not authorize a preliminary dismissal of a petition for arbitration because some policy issues need to be addressed by the state commission. Compl., Ex. A at 12. Unless the IURC has ruled as a matter of law that the 1996 Act does *not* apply to Ameritech's petition, it argues, or that the petition is defective, the arbitration must proceed. *Id.* Ameritech distinguishes the Eighth Circuit case relied on by Smithville, as applying only to "preexisting interconnection agreements" and not to new formal requests for interconnection agreements occurring after the 1996 Act. *Id.* at 13. It also notes that the petitions are not a violation of the status quo order, because Ameritech will continue to provide EAS service while the arbitration proceeds. *Id.* The status quo order, Ameritech asserts, did not toll the 160 day limitation period for filing a petition to arbitrate. *Id.*

These arguments can be interpreted as an accusation that the IURC is simply refusing to comply with § 252's requirements for approving an interconnection agreement. They do not suffice to confer jurisdiction on this Court where it is lacking under the statute. Ameritech further argues that Smithville failed to offer proof that the IURC could not address policy issues in the context of an arbitration proceeding. *Id.* In fact, it suggests that in doing so the IURC would make more efficient use of its time. *Id.* If the Commission must first make separate public policy determinations before it can address the arbitration petitions, Ameritech argues, it would cause undue delay. *Id.*

In support of its decision to make preliminary findings before addressing the interconnection agreements, the IURC notes that it has been asked before to determine if the § 251 requirements apply to current EAS arrangements, and has found that current EAS arrangements are not a separate ser-

---

7. A state commission is statutorily obligated, however, to reach a decision about exemption issues within 120 days of receiving notice from a telecommunications carrier of a request for interconnection services from a rural LEC. 47 U.S.C. § 251(f)(1)(B). It would also be required to reach a decision within 180 days of a petition from a rural or small LEC seeking suspension or modification. It does not appear that the parties in this action have clearly designated any of their acts as being under any of these provisions. In the future, the IURC and the LECs invoking its participation under § 252, should more clearly state the basis for any petitions or decisions under the Act.

vice offered to subscribers, but a bundled service. As a result, EAS cannot be resold as a stand-alone service (resale is a requirement under § 251(c)), and that finding applies equally for purposes of interconnection with other LECs. Compl., Ex. A at 17. In other words, the IURC must determine how to classify EAS for purposes of the 1996 Act before it can approve any interconnection agreements involving EAS. Although the IURC has acknowledged that the existing EAS agreements "do not involve competitive circumstances," it ordered dismissal of the arbitration petitions because they were filed at a time when suspensions (of obligations under the 1996 Act) were in place. *Id.*

■ The Court has already found a statutory basis for consolidating the arbitration petitions with the other investigations, and for suspending the operation of the Act's requirements for a rural LEC. In addition, there is statutory justification for modification of the strict time constraints of § 252 for such carriers. Thus, the IURC's action of suspending operation of the Act's requirements, which it did when it dismissed the arbitration petitions, cannot be considered a refusal to act under § 252 if the ongoing investigations are of the type that qualify for consolidation and modification. Based on its review of the April 1, 1998, order, the Court finds that they are.

In its order, the IURC noted the ongoing investigation based on the Smithville petition, and clarified the assumptions governing that investigation. Compl., Ex. A at 18. First, it noted that the existing EAS agreements provided subsidies to many of the LECs, and that the subsidies may form a substantial portion of their total revenue. Consequently, converting those arrangements to the type sought by Ameritech may require significant rate increases for local customers. Second, application of the universal service fund provisions of the Act may eliminate this problem, but investigation into the implementation and distribution of such a fund is needed, which investigation would

take "quite some time." *Id.* The investigation involves obtaining information from as yet incomplete cost studies, as well as taking subsequent measures to "re-balance" the various rate components of the rural ILECs. *Id.* Third, until these investigations are completed, the IURC lacks the necessary information for determining the propriety of a reciprocal compensation agreement for EAS. *Id.* For these reasons, the IURC deferred to its investigation in the Smithville case, which would result in an appropriate definition and categorization of EAS traffic as it would apply under the 1996 Act. *Id.* at 19.

Because the IURC expected the necessary investigations to take a long time, it ordered the ILECs to "make a proposal for an interim replacement of existing EAS arrangements...." that would be effective until other information became available to allow a final agreement. *Id.* Consequently, the IURC dismissed the arbitration petitions, and ordered an attorney conference in the Smithville case, to discuss a relevant procedural schedule. *Id.* That schedule would allow for consideration of specific proposals, including Ameritech's proposed agreement, for an interim replacement of the existing EAS arrangements.[8] *Id.* The interim agreements would be effective until sufficient cost-based and universal service fund information was available to allow for a final interconnection agreement as contemplated by the Act. *Id.* This portion of the dismissal orders indicates the IURC's intent to participate in the process of negotiating and approving interconnection agreements between the LECs, if it determines EAS agreements are subject to the 1996 Act.

No arguments or proof have been offered to this Court that the IURC's consolidation of the arbitration petitions with the pending Smithville case was inconsistent with any of the provisions of the Act. It cannot be disputed that the issues raised by the arbitration petitions were, or could be, included in the case remaining before the IURC. The consolidation was authorized by § 252(g), which means the IURC has not refused to act

---

8. It is not clear at this point if the interim agreements would be considered interconnection agreements under § 252 that would be subject to commission approval and federal district court review. Before proceeding with this plan, the IURC should be clear about the purpose, and the statutory basis for and potential consequences of an interim EAS agreement.

under § 252 on the arbitration petitions. Nor has any party claimed that the IURC has completed an inquiry into and made a determination regarding the exemption status of the rural LECs, or their entitlement to suspensions or modifications. Ameritech is the party invoking this Court's jurisdiction, which makes it responsible for introducing such evidence. The arbitration petitions, and the Requests that preceded them, had set a statutory time clock running, and the IURC knew it could not meet the statutory deadlines. Consequently, it dismissed the arbitration petitions to gain more time to deal with the applicability and universal service issues.

The fact that the IURC ordered the parties to submit proposed interim agreements to be effective until a final one could be approved, strongly suggests that the decision to dismiss Ameritech's petitions was not intended as a final agency decision on the issue of interconnection agreements. Nor should it be considered a refusal by the IURC to act under § 252. The IURC appears to be fully intent on acting pursuant to its statutory duties once it has the information needed to act appropriately. Even if the IURC's decision could be considered a refusal to act, Ameritech's exclusive remedy would be to enlist the aid of the FCC before it could obtain a federal court's review of agency actions.

### E. Exhaustion of Administrative Remedies

■■■ One final issue was raised by the LEC defendants, joined by the State Defendants, which is ·that Ameritech has failed to exhaust its administrative remedies.[9] The Court agrees and finds this to be an alternate ground for dismissing this action. No one is "entitled to judicial relief for a supposed or threatened injury" from an administrative ruling, until the administrative remedy has been exhausted. *Hunt v. Commodity Futures Trading Comm.,* 591 F.2d 1234, 1236 (7th Cir.1979). In this way, courts avoid

reviewing cases that may result in determinations favorable to a petitioner if pursued with the agency to the end, and they ensure that an adequate record will be available for any necessary review. *Id.* As noted in the discussions above, Ameritech had other remedies to pursue at the agency level, either with the IURC or the FCC, and access to subsequent judicial review. For this reason, it must exhaust those remedies before asking for this Court's involvement.

Ameritech argues that failure to exhaust such remedies is not jurisdictional, and that this Court may excuse it if exhaustion would be futile, or if the agency action would violate a clear right of the petitioner. *See Zipp v. Geske & Sons, Inc.,* 103 F.3d 1379, 1383 (7th Cir.1997); *Abercrombie v. Office of the Comptroller of the Currency,* 833 F.2d 672, 675 (7th Cir.1987) (noting that statutory authority exception should be narrowly construed); *Hunt,* 591 F.2d at 1236 (describing exhaustion requirement and clear right exception). Although the Court finds that exhaustion of administrative remedies is jurisdictional in this circumstance, where Congress has given a federal court jurisdiction to review a state agency's final determination, it will address Ameritech's argument. According to Ameritech, its case falls within the "clear right" exception, because it has a federal right to arbitration of the terms of an interconnection agreement and the IURC, in dismissing the arbitration petitions, denied Ameritech that right.

■■ Ameritech is wrong. When Congress established the comprehensive statutory provisions in the 1996 Act, it intended for the scheme to mesh with existing statutory and regulatory provisions. An important part of those provisions had been the state commission's authority over rates, classifications, practices, services, facilities or regulations related to intrastate telecommunications services. *See Iowa Util.,* 120 F.3d at 804. By allowing the state commission to

---

9. Exhaustion of administrative remedies is an argument that presumes the court has jurisdiction over the matter in the first place, such as in cases involving federal agencies under the Administrative Procedures Act. Because the Court here has found that it does not have jurisdiction

over the proceedings before the state commission without exhaustion, this argument may seem redundant. It will nevertheless be explored despite the absence of subject matter jurisdiction because it relates to the subject matter jurisdiction analysis.

exempt rural LECs from the § 251 requirements, or modify those requirements for small or rural LECs, Congress recognized the need to balance the goal of increased competition with the state's interest in maintaining universal service. This is why the Act allows different treatment, at the state commission's discretion, of interconnection requirements for rural LECs. That is also why Ameritech has failed to demonstrate it has a clear right to arbitration. Any "right" it has to arbitration is subject to a preliminary determination by the IURC that the rural LECs must comply with the Act's requirements.

The Court must look to the statute as a whole, not just one particular provision, when determining if a clear right has been violated. Here, the arbitration provision was taken out of context when Ameritech asserted its right. If the Court were to allow this to form the basis of an exception to the exhaustion of remedies requirement, it would disrupt the entire statutory scheme. By carefully dividing responsibilities for the different rulings needed before a final, enforceable agreement is in place, Congress expressed its recognition of and appreciation for the technical expertise of the state agency for regulating the intrastate telecommunications industry. The state commission is entrusted with responsibility for making public policy determinations, and decisions that will protect the universal service that has been in place as a result of monopolistic paternalism.

The larger telecommunications companies historically have provided services to the smaller at rates that do not reflect their cost or the market value. They also buy services from the smaller carrier at rates that provide a subsidy to that carrier. In this way, states have been able to make sure that telecommunications services are available everywhere— even where it is remote, expensive and not subject to growth. The IURC must consider how these concerns will be addressed by any new EAS agreements between Ameritech and the rural LECs from whom it seeks interconnection services agreements. Until it makes these determinations, Ameritech has no right to arbitration.

For these reasons, the Court finds that the IURC is not depriving Ameritech of a clear federal right by its insistence on having sufficient time to explore important intrastate issues relating to rural LECs. The Court will not relieve Ameritech from its duty to exhaust all of its administrative remedies before attempting to invoke this Court's jurisdiction.

### F. Subject Matter Jurisdiction under § 252

In sum, the only basis for this Court to have jurisdiction over a decision from the IURC comes from the statutory process involving LECs reaching an agreement, submitting it for approval, and the IURC either approving it or rejecting it, with written findings. 47 U.S.C. § 252. A federal district court may then review that decision. The statute establishes a framework in which the court may act in an appellate capacity to review the agency findings, rather than as a fact-finding trial court. Given this structure, the Court is prevented from exercising its jurisdiction in this case because it cannot make technical findings or review a decision that has not been made. Rather, the only "decision" made was to stop the course of § 252 events until certain preliminary findings could be made by the IURC. Those findings were necessary given that the LECs involved were rural LECs entitled to an exemption from the requirements of § 251 until a State commission removed the exemption. They also may have been eligible for distributions from a universal service fund and for suspensions or modifications of the statutory requirements for reciprocal compensation. With these "exceptions" to the rule in place, Congress must have intended that some cases would not progress along the time-line set up for ordinary cases. The mere fact that Congress did not specifically declare that a state commission could stop the clock does not mean that the IURC's actions were arbitrary and capricious.

At best, Ameritech is in a position where it can either accept the IURC's interim decision, wait for the promised findings and then proceed with the negotiation process, or take advantage of the statute's remedy of notifying the FCC that the IURC is failing to act.

As noted in sub-part D, this Court does not consider the IURC's decision a failure to act. If it were, then Ameritech might be able to obtain the approval or rejection of its proposed interconnection agreement that would allow a federal court to get involved by asking the FCC to "preempt" the IURC's jurisdiction. This is the exclusive remedy for a state agency failing to follow the § 252 procedures, and it represents the only other way Ameritech could properly invoke a federal court's jurisdiction. Because this course was not, and cannot be, followed all claims to federal subject matter jurisdiction fail.

## III. CONCLUSION

The Court has found that it does not have subject matter jurisdiction over the claims that the EAS agreements between Ameritech and the rural LECs are not in compliance with the 1996 Act, and thus it cannot render a declaratory judgment or grant any other injunctive relief. It has found that the decision in question was not a final agency action and that Ameritech must allow the agency process to reach a conclusion before it can invoke this Court's jurisdiction under § 252 of the Act. Even if jurisdiction existed, which it would if the Court were being asked to review a federal agency's actions, Ameritech has other remedies available to it under the Act. Those remedies are subject to judicial review, and must be exhausted before this Court should act.

There are two possible remedies for Ameritech to pursue: 1) accept the IURC's decision to consolidate the § 252 action with the § 214, § 251(f) and § 253 actions, and allow the administrative process to continue; or 2) deem the IURC dismissal of Ameritech's arbitration petitions as a refusal to act, and notify the FCC of the need for its involvement to act for the State Commission. If Ameritech follows the former path, then the Court has found that there is no § 252 determination yet for judicial review. If it follows the second, an action the Court has found no basis for taking, there will be no final agency decision for a court to review until after the FCC makes a determination. Either way, this Court should acknowledge the jurisdictional and prudential concerns that instruct against taking jurisdiction of a case such as this.

The State Defendants' and ILECs' motion to dismiss should be granted. Because the Court has found that it does not have subject matter jurisdiction over any of the claims raised in this dispute, it *sua sponte* also finds that this ruling applies to all defendants in this action, regardless of whether they joined in the motion to. dismiss. For all the reasons provided herein, this case is **DISMISSED, without prejudice.**