**BELL ATLANTIC–DELAWARE, INC., Plaintiff,**

**United States of America, Intervenor,**

**v.**

**GLOBAL NAPS SOUTH, INC.; the Delaware Public Service Commission; Robert J. McMahon; Joshua M. Twilley; Arnetta McRae; Donald J. Puglisi; and John R. McClelland, Defendants,**

**AT & T Communications Of Delaware, Inc., Intervenor.**

**No. CIV. A. 99–466–RRM.**

United States District Court, D. Delaware.

Dec. 14, 1999.

William E. Manning, Bonnie L. Metz, Duane, Morris & Heckscher LLP, Wilmington, DE, David A. Hill, Bell–Atlantic Delaware, Inc., Wilmington, DE, Mark L. Evans, Sean A. Lev, Antonia M. Apps, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC, for plaintiff.

Carl Schnee, United States Attorney, Donald Remy, Acting Assistant Attorney General, Virginia Gibson–Mason, Assistant United States Attorney, United States Attorney's Office, Wilmington, DE, Theodore C. Hirt, David T. Zaring, U.S. Department of Justice, Federal Programs Branch, Washington, DC, for Intervenor United States of America.

Wendie C. Stabler, Scott J. Jensen, Saul, Ewing, Remick & Saul, LLP, Wilmington, DE, Christopher W. Savage, Geoffrey C. Cook, Cole, Raywid & Braverman, L.L.P., Washington, DC, William J. Rooney, Jr., Global NAPs South, Inc.,

Quincy, Massachusetts, for defendant Global Naps South, Inc.

Francis J. Murphy, Jonathan L. Parshall, Murphy Spadaro & Landon, Wilmington, DE, for defendant Delaware Public Service Commission.

Jeffrey M. Weiner, Law Offices of Jeffrey M. Weiner, Wilmington, DE, Mark A. Keffer, Michael A. McRae, AT & T Communications, Oakton, VA, David M. Levy, David L. Lawson, Michael L. Post, Sidley & Austin, Washington, DC, for intervenor AT & T Communications of Delaware, Inc.

## OPINION

McKELVIE, District Judge.

This is a telecommunications case. Plaintiff Bell Atlantic–Delaware ("BA–Del") is a Delaware corporation that provides telecommunications services. Defendant Global NAPs South, Inc. ("GNAPs") is also a telecommunications company. It is a Virginia corporation with its principal place of business in Quincy, Massachusetts. Defendant Delaware Public Service Commission ("PSC") is a regulatory agency created and existing under the laws of Delaware. It has jurisdiction over the intrastate activities of telecommunications companies operating in Delaware, and is headquartered in Dover. Other listed defendants are commissioners of the PSC.

Intervenor AT & T Communications of Delaware, Inc. is a Delaware corporation that provides telecommunications services. Intervenor Federal Communications Commission is a regulatory agency created and existing under the laws of the United States.

BA–Del has invoked the jurisdiction of this court to review the decision of the PSC to approve an arbitration award establishing an interconnection agreement between BA–Del and GNAPs. 47 U.S.C. § 252(e)(6).[1] BA–Del contends that the PSC improperly permitted GNAPs to opt into an existing agreement, and that the terms imposed by the PSC contradict the requirements of federal law. 47 U.S.C. § 251.

## I. FACTUAL, LEGAL, AND PROCEDURAL BACKGROUND

The court draws the following facts from the complaint, the answer, the affidavits submitted by the parties, and the record of the proceedings before the Delaware PSC.

### A. The Interconnection Agreement

BA–Del has a monopoly over the provision of local telephone service in Delaware. BA–Del qualifies as an incumbent local exchange carrier (ILEC) under the Telecommunications Act of 1996, Pub.L. No. 104, 110 Stat. 56 (1996) (the "1996 Act"). The 1996 Act imposes certain obligations on incumbent carriers, such as BA–Del, to encourage competition in local telecommunications markets. One of those obligations is the duty of an incumbent carrier to "interconnect" its facilities with those of new entrants. See 47 U.S.C. § 251(c)(2).[2]

---

1. 47 U.S.C. § 252 establishes procedures for negotiation, arbitration, and approval of agreements, and provides in subsection (e)(6) that:

> In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement

or statement meets the requirements of section 251 of this title and this section.

2. 47 U.S.C. § 251(c) provides:

> (c) Additional obligations of incumbent local exchange carriers
> In addition to the duties contained in subsection (b) of this section, each incumbent local exchange carrier has the following duties:
> (1) Duty to negotiate
> The duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of agreements to fulfill the duties described

Interconnection allows subscribers to a new entrant's telecommunications service to make calls to, and receive calls from, subscribers to an incumbent's service.

GNAPs seeks to compete with BA–Del in a number of markets for intrastate and interstate telecommunications services in Delaware. One market GNAPs has pursued is offering Internet service providers (ISPs) dial-in connections to the public switched telephone network. GNAPs sought to enter into an interconnection agreement with BA–Del on July 2, 1998, pursuant to § 251(c) and § 252(a) of the 1996 Act. Section 252(a) authorizes parties to enter into interconnection agreements through voluntary negotiations, or through mediation at the State commission.[3]

By September 1998, GNAPs and BA–Del had yet to arrive at an agreement through voluntary negotiations. In an effort to obtain interim relief to provide telecommunications services before approval of a final interconnection agreement, GNAPs sought to opt into an existing interconnection agreement between BA–Del and another carrier, MFS Intele-

net of Delaware, Inc. ("MFS"). The MFS agreement has a three-year duration with a termination date of July 1, 1999. Requesting carriers may opt into existing interconnection agreements pursuant to § 252(i) of the 1996 Act. The 1996 Act requires an incumbent to make available any interconnection service or network element provided under that agreement to any other carrier "upon the same terms and conditions as those provided in the agreement." 47 U.S.C. § 252(i).[4]

GNAPS and BA–Del did not reach an agreement regarding GNAPs' opt-in rights. On December 9, 1998, GNAPs filed a petition with the Delaware PSC pursuant to § 252(b) and § 252(i) to arbitrate the disputed terms of the proposed opt-in agreement. Section § 252(b) permits a requesting party to petition the State regulatory commission to arbitrate an interconnection agreement when voluntary negotiations between the parties have failed.[5] GNAPs argued to the PSC that it is entitled to opt into the MFS agreement for a term of three years, without being

---

in paragraphs (1) through (5) of subsection (b) of this section and this subsection. The requesting telecommunications carrier also has the duty to negotiate in good faith the terms and conditions of such agreements.
(2) Interconnection
The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network.

**3.** 47 U.S.C. § 252(a) provides:
(a) Agreements arrived at through negotiation
(1) Voluntary negotiations
Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement

negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section.
(2) Mediation
Any party negotiating an agreement under this section may, at any point in the negotiation, ask a State commission to participate in the negotiation and to mediate any differences arising in the course of the negotiation.

**4.** 47 U.S.C. § 252(i) provides that "[a] local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement."

**5.** 47 U.S.C. § 252(b)(1) provides that "[d]uring the period from the 135th day to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues."

bound by the July 1, 1999 termination date recited in the agreement.

On March 9, 1999, the PSC Arbitrator, G. Arthur Padmore, issued an Award which, among other things: (a) permitted GNAPs to opt into the MFS agreement; and (b) extended the termination date in the MFS agreement for GNAPs from July 1, 1999, to December 31, 1999.

On May 11, 1999, the PSC approved the interconnection agreement as interpreted in the Arbitration Award, thus rendering the agreement final. 47 U.S.C. § 252(e)(1).[6] On June 22, 1999, the PSC issued additional findings, which substantially adopted the reasoning of the Arbitrator.

### B. *The Lawsuit*

On July 21, 1999, BA–Del filed a complaint in this court seeking relief from the PSC ruling. The complaint states three counts. Count I states that the "PSC's decision that GNAPs was entitled to 'opt in' to the MFS Agreement with a six-month extension of the termination date violates the 1996 Act and the FCC's rules implementing the 1996 Act, is arbitrary and capricious, and is not the result of reasoned decision making." Counts II and III contest the legality of specific terms of the agreement. BA–Del requests that this court enter an order declaring that the PSC's decision is unlawful; enjoining the defendants from seeking to enforce that unlawful decision; and granting BA–Del such further relief as the Court may deem just and equitable.

The complaint states that the court has jurisdiction over the present matter pursuant to the judicial review provision of the Telecommunications Act of 1996, 47 U.S.C. § 252(e)(6), and pursuant to 28 U.S.C. § 1331.[7]

On August 12, 1999, GNAPs filed its answer, in which it asserted three affirmative defenses: 1) that the complaint fails to set forth a claim upon which relief may be granted; 2) that plaintiff's claims are barred by waiver and/or estoppel; and 3) that the actions of defendants are not unlawful in that they have complied with all applicable statutes and regulations.

On August 19, 1999, the PSC filed a motion to dismiss the action on the grounds that state sovereign immunity prohibits BA–Del from maintaining the present action, and that BA–Del's claims for relief are not ripe for decision.

On August 20, 1999, BA–Del filed a motion for summary judgment on all claims set forth in its complaint.

On August 26, 1999, the PSC filed a motion to stay briefing of BA–Del's motion for summary judgment pending disposition of the PSC's motion to dismiss.

On August 27, 1999, AT & T filed a motion to intervene in opposition to plaintiff's complaint for declaratory and injunctive relief. AT & T filed therewith an answer to BA–Del's complaint.

On August 31, the court participated in a teleconference with the parties and discussed the PSC's motion to stay briefing on the merits pending resolution of the eleventh amendment issue. The court instructed the parties to complete briefing the merits of the case so that the court could better understand the context of the sovereign immunity dispute.

On September 2, 1999, the PSC filed a motion to stay all proceedings except those related to the PSC's pending motion to dismiss.

---

6. 47 U.S.C. § 252(e)(1) provides that "[a]ny interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies."

7. 28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

On September 27, 1999, GNAPs filed a motion for summary judgment for all affirmative defenses set forth in its answer.

On September 27, 1999, the United States filed an unopposed motion to intervene in opposition to the PSC's motion to dismiss. The court granted the motion to intervene on September 30, 1999.

This is the court's ruling on the motions.

## II. DISCUSSION

### A. The PSC's Motion to Stay the Proceedings Pending Resolution of the Motion to Dismiss on Eleventh Amendment Grounds

The PSC filed two motions to stay proceedings in this litigation pending resolution of the PSC's motion to dismiss on eleventh amendment grounds. The PSC argues, in particular, that it should not be required to submit briefing on the merits of the case pending resolution of the sovereign immunity issue. In a conference call, the court directed the parties to complete briefing on the merits because of the following reasons.

The present dispute does not require additional discovery or a trial. All factual matters in the case are contained in the record of the proceedings at the PSC, and the record is closed for the purposes of the present dispute. *See* Section II.D. 1, *infra.* For the PSC to submit briefing on the merits of the case does not put the PSC to the time or expense of discovery or a trial.

Moreover, the court has often found that the briefing on the merits of a case gives a helpful context in which to determine whether a sovereign party has waived its immunity. The recent Supreme Court case of *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* —— U.S. ——, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) emphasizes that the activities engaged in by the sovereign are pivotal factors to be weighed in eleventh amendment cases. This factual basis is often best developed in the brief-

ing on the merits, which then aids the court in its resolution of the eleventh amendment issues.

The caselaw recognizes a number of procedural rules that serve to protect the eleventh amendment rights of States. Issues of sovereign immunity are threshold matters in litigation that must be disposed of "at the earliest possible stage." *Orsatti v. New Jersey State Police,* 71 F.3d 480, 483 (3d Cir.1995). Eleventh amendment claims must not be deferred pending other proceedings before the trial court. *See Bouchard Transportation Co. v. Florida Department of Environmental Protection,* 91 F.3d 1445, 1447 (11th Cir.1996) (ruling that trial court erred when it reserved a ruling on sovereign immunity issues and ordered parties to mediate). If an eleventh amendment claim is denied, the sovereign party is entitled to an immediate interlocutory appeal. *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993). And during an interlocutory appeal from the denial of an eleventh amendment claim, the trial court should stay all further proceedings. *Goshtasby v. Board of Trustees,* 123 F.3d 427 (7th Cir.1997). These basic principles are not violated by requiring the PSC to brief the merits of the case, particularly where no additional discovery is required. Briefing on the merits proceeded simultaneously with briefing on sovereign immunity, causing little delay in the court's decision on the eleventh amendment issue. Having the parties submit briefing on the merits is a minor burden imposed on the PSC that permits the court to come to a sound result on the issue of sovereign immunity.

### B. The PSC's Motion to Dismiss

The PSC has filed a motion to dismiss the complaint, asserting that it is entitled to sovereign immunity under the Eleventh Amendment and that the action is not yet ripe for decision.

### 1. *Sovereign Immunity*

The PSC contends that, as an arm of the State of Delaware, it is immune from suit in federal court in the present matter. The PSC acknowledges that two federal courts of appeals have already ruled that federal jurisdiction extends to state regulatory commissions such as the PSC. *See Michigan Bell Telephone Co. v. Climax Telephone Co.*, 186 F.3d 726 (6th Cir.1999); *MCI Telecommunications Corp. v. Illinois Commerce Commission*, 183 F.3d 558 (7th Cir.1999). The PSC argues, however, that recent Supreme Court cases have rendered these decisions obsolete, and that the present action should now be dismissed in light of the Court's pronouncements. *See Florida Prepaid Postsecondary Education Expense Board,* —— U.S. ——, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* —— U.S. ——, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Alden v. Maine,* —— U.S. ——, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

■ The Eleventh Amendment of the United States Constitution provides that:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court recognizes three circumstances in which federal jurisdiction extends to suits against the States. First, Congress may abrogate States' sovereign immunity through the passage of legislation enacted pursuant to § 5 of the Fourteenth Amendment. *Florida Prepaid,* —— U.S. at ——, 119 S.Ct. at 2205. Second, a State can consent to the waiver of its sovereign immunity. *See College Savings,* —— U.S. at ——, 119 S.Ct. at 2226. And third, federal courts may assert jurisdiction over state officials when the suit seeks prospective injunctive relief in order to end a continu-

ing violation of federal law. *See Seminole Tribe,* 517 U.S. at 73, 116 S.Ct. 1114; *Ex parte Young,* 209 U.S. 123, 167, 28 S.Ct. 441, 52 L.Ed. 714 (1908). These three circumstances will be discussed in turn to determine upon what grounds, if any, the court may assert jurisdiction over the PSC and/or its commissioners.

### a. *Abrogation*

■ The Court recognizes that Congress may abrogate the States' sovereign immunity through the passage of legislation enacted pursuant to § 5 of the Fourteenth Amendment. *See Florida Prepaid,* —— U.S. at ——, 119 S.Ct. at 2205. Congress may not, however, abrogate States' sovereign immunity by passing legislation pursuant to its powers under Article I of the Constitution. *See Seminole Tribe,* 517 U.S. at 72–73, 116 S.Ct. 1114. The parties do not dispute that the Telecommunications Act of 1996 was enacted pursuant to Congress's Article I powers, and thus that the passage of the Act did not itself abrogate the PSC's sovereign immunity.

### b. *Waiver*

The Court has long acknowledged that a State may voluntarily waive its sovereign immunity. *See Beers v. Arkansas,* 61 U.S. 527, 529, 20 How. 527, 15 L.Ed. 991 (1857). A State may waive its sovereign immunity by voluntarily invoking federal jurisdiction or by making a clear declaration that it intends to submit itself to federal jurisdiction. *College Savings,* —— U.S. at ——, 119 S.Ct. at 2226. Prior to 1999, the Court did not require that a State expressly waive its sovereign immunity. Rather, the Court had recognized that a State could constructively waive its immunity by engaging in activities governed by federal law. *See Parden v. Terminal Railway of Alabama State Docks Department,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). This year, however, the Court annulled the constructive waiver doctrine. *See College Savings,* —— U.S. at ——, 119 S.Ct. at 2228 ("We think that the constructive-

waiver experiment of *Parden* was ill conceived, and see no merit in attempting to salvage any remnant of it."). To understand what remains of the waiver doctrine in the wake of *College Savings* requires an analysis of the activities engaged in by the state governments in *Parden* and *College· Savings*.

In *Parden*, the State of Alabama owned and operated a railroad, thereby engaging in interstate commerce. *Parden*, 377 U.S. at 185, 84 S.Ct. 1207. In *College Savings*, the State of Florida administered a tuition prepayment program designed to provide individuals with sufficient funds to cover future college expenses. *College Savings*, — U.S. at ——, 119 S.Ct. at 2223. The common basis of *Parden* and *College Savings* is that the States therein acted under their sovereign authority in performing the functions at issue. Running a railroad or offering college tuition savings plans, the Court noted, are permissible activities which a sovereign may perform without congressional approval. *See College Savings*, — U.S. at ———– ——, 119 S.Ct. at 2228–29. In *College Savings*, the Court ruled that the States did not waive their sovereign immunity by performing these functions. By attempting to impose liability on the States for engaging in "otherwise permissible activit[ies]," Congress in effect threatened the States with a sanction for exercising their sovereign rights. *College Savings*, — U.S. at ——, 119 S.Ct. at 2231.

In *College Savings*, the Court limited its repeal of the waiver doctrine to "*Parden*-style" waivers, or constructive waivers. *College Savings*, — U.S. at ——, 119 S.Ct. at 2229. The Court acknowledged that the activities engaged in by sovereigns in *Parden* and *College Savings* were "fundamentally different" from those in other cases where the Court had recognized a waiver of sovereign immunity. *Id.* One such case is *Petty v. Tennessee–Missouri Bridge Commission*, 359 U.S. 275, 79

S.Ct. 785, 3 L.Ed.2d 804 (1959). In *Petty*, the States of Tennessee and Missouri sought to enter into an interstate compact to authorize them to build a bridge and operate ferries across the Mississippi River. As required by the Compact Clause of the Constitution,[8] the States submitted the compact to Congress for approval. Congress granted its approval, conditioning it, however, on a waiver of the States' sovereign immunity. Since the States of Tennessee and Missouri lacked authority as sovereigns to enter into the compact without permission of Congress, the Court reasoned, Congress could validly require the States to consent to suit in federal court for activities arising under the compact. *See Petty*, 359 U.S. at 281–82, 79 S.Ct. 785.

In the present matter, the critical question is whether the Delaware PSC exercised its own sovereign authority, apart from a grant of federal power, in arbitrating the interconnection agreement at issue. If the PSC issued its order pursuant to its sovereign authority, then it acted much like the States in *Parden* and *College Savings*, and the PSC did not waive its sovereign immunity merely by exercising its authority in a federally regulated field. If, on the other hand, the PSC lacked authority apart from a federal grant of power to govern the interconnection proceedings, then the PSC acted like the States in *Petty*, and federal jurisdiction applies.

This court acknowledges that States have the sovereign authority to regulate businesses within their borders according to their own laws. Here, however, there is no indication that the PSC was exercising its own sovereign authority by presiding over the interconnection agreement at issue. Rather, the PSC elected to exercise a federal grant of authority. Interconnection agreements are governed by federal law. *See AT & T Corporation v. Iowa Utilities Board*, 525 U.S. 366, 119 S.Ct. 721, 732, 142 L.Ed.2d 835 (1999) (upholding the validity of FCC rulemaking au-

---

**8.** Article I, § 10, cl. 3 of the U.S. Constitution provides that "No State shall, without the

Consent of Congress, ..., enter into any Agreement or Compact with another State."

thority over pricing methodology in § 252 interconnection agreements). The Telecommunications Act offers state regulatory commissions a choice: a commission may govern the interconnection proceedings according to federal law, or it may decline to act. 47 U.S.C. § 252(e)(5). States are in no way penalized for declining to accept authority under the 1996 Act. When a state commission arbitrates an interconnection agreement under § 252, it elects to assume federal authority.

There is no question that the PSC acted under federal law when it presided over the interconnection agreement between BA–Del and GNAPs. As a preliminary matter, the Delaware General Assembly specifically authorized the PSC to conduct proceedings in accord with the Telecommunications Act of 1996. Delaware law provides:

> The Commission is authorized and empowered to take such actions, conduct such proceedings (including mediation, arbitration and review of agreements and statements of terms and conditions) and enter such orders as permitted or required by a "state commission" under the Telecommunications Act of 1996, Pub.L. 104–104. In exercising such authority and in the conduct of such proceedings, the Commission shall act in accord with the applicable provisions of the Telecommunications Act of 1996.

26 Del. C. § 703(4). GNAPs articulated its petition wholly in terms of federal law, requesting that the PSC arbitrate the agreement pursuant to § 252 of the 1996 Act. Nowhere does GNAPs refer to Delaware law in its petition. Similarly, the PSC's June 22, 1999 opinion refers only to federal law. Indeed, the PSC recognized that its findings would be directly reviewable in federal court. In promulgating guidelines to implement § 252 of the 1996 Act, the PSC acknowledged that "the federal Act specifically bars ... state court review, granting judicial oversight to the federal courts instead." Order No. 4245, *In re Informal Adoption of Guidelines to Govern Negotiations, Mediation, Arbitration, and Approval of Agreements Conducted Pursuant to the Telecommunications Act of 1996*, PSC Docket No. 96–172, Exh. A, at 2 (Delaware PSC July 23, 1996). The PSC governed the entire proceedings according to federal law, and recognized that its findings would be reviewable in federal court. There is no suggestion that the PSC exercised its sovereign authority during the arbitration of the interconnection agreement. Rather the PSC assumed federal authority and exercised it throughout the proceedings.

Because the PSC was not exercising its sovereign authority in its arbitration of the interconnection agreement between BA–Del and GNAPs, it is not entitled to sovereign immunity for its acts. The court rules that the PSC waived its immunity by engaging in regulatory activities outside its sphere of sovereign authority.

### c. *Ex parte Young*

█ Even if the PSC had not waived its sovereign immunity, as discussed above, there remains one ground upon which this court may assert jurisdiction over the individual commissioners of the PSC. Under the rubric of *Ex parte Young*, BA–Del may seek prospective injunctive relief in federal court against State officials in their official capacity. *See Young*, 209 U.S. at 159–61, 28 S.Ct. 441. The court notes that the Sixth Circuit, in a case analogous to this one, stated that the interconnection dispute was "a straightforward *Ex parte Young* case." *Michigan Bell Telephone Co. v. Climax Telephone Co.*, 186 F.3d 726 (6th Cir.1999). The PSC makes no indication in its briefing that recent Supreme Court cases have altered the application of *Ex parte Young* since the Sixth Circuit's decision in *Michigan Bell*.

Federal courts may exercise jurisdiction over state officials in their official capacity under the doctrine of *Ex parte Young. See Young*, 209 U.S. at 159–61, 28 S.Ct. 441. The *Young* doctrine recognizes that States are bound by the Supremacy Clause

of the U.S. Constitution to adhere to federal law, and that a state official who violates federal law cannot properly claim to be acting in the name of the State. *See id.* at 159–60, 28 S.Ct. 441. As such, the State has no power to impart to the offending official immunity from suit in federal court. *See id.* at 160, 28 S.Ct. 441.

The Supreme Court limited the application of *Young* in *Seminole Tribe.* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252. In *Seminole Tribe,* the Court ruled that it would not extend federal jurisdiction to suits against States where the structure of the underlying federal law evinces congressional intent to disallow direct suits against the State. In that case, the Court noted that the federal law at issue provides for a series of limited remedies against a noncomplying State, none of which amount to a direct suit against the State. Noting that the application of *Young* would provide a stricter remedy that those contemplated by statute and would render the other remedies superfluous, the Court disallowed suit against the State under *Young.*

In the present case, by contrast, the remedy provided for by statute and the remedy under *Young* are one and the same. Under § 252(e)(6), a federal court will review the PSC's ruling to see if it comports with federal law. Under *Young,* a federal court will review the ruling of the PSC's commissioners to determine if they properly applied federal law. There is no substantive difference between these two actions, and so *Seminole Tribe* does not bar suit against the PSC under the doctrine of *Ex parte Young.*

For the reasons articulated above, the court rules that the Eleventh Amendment does not bar the present action against the PSC.

### 2. *Ripeness*

■ The PSC also asserts that the court should dismiss the action for lack of federal jurisdiction because the case is not ripe. The PSC notes that GNAPs has not yet received final authorization to provide telecommunications services in Delaware, and that the interconnection agreement will terminate on December 31, 1999. Because GNAPs might never provide telecommunications services in Delaware during the term of the agreement, the PSC reasons, this action is not ripe for decision.

The court notes that the explicit terms of the 1996 Act direct the court to adjudicate the present action. Section 252(e)(6) provides that "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement … meets the requirements of section[s] 251 … and [252]." 47 U.S.C. § 252(e)(6).

The caselaw indicates, moreover, that the action is ripe for adjudication. A case is ripe when it presents issues that are fit for judicial decision and when withholding review would cause the plaintiff significant and needless hardship. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Because the facts of the case have been established by the PSC and because the PSC's decision is final, the case is fit for judicial decision. *See Consolidated Rail Corp. v. United States,* 812 F.2d 1444, 1451 (3d Cir.1987).

BA–Del, moreover, stands to incur substantial harm if this court dismisses the complaint. The PSC's decision has established the rights and obligations of the parties under the interconnection agreement. GNAPs litigated this case before the PSC presumably because it intends to provide services under the interconnection agreement. The PSC does not dispute that GNAPs has the right to begin offering service once it files a revised tariff schedule. The possibility of GNAPs filing such a schedule is by no means such a remote contingency as would render this dispute unripe for adjudication. *See Armstrong World Industries v. Adams,* 961 F.2d 405,

424 (3d Cir.1992) (suggesting that the contingent claims of plaintiff's complaint would render the dispute nonjusticiable).

For the reasons discussed above, the court finds that federal jurisdiction extends to the present case. Accordingly, the court will deny the PSC's motion to dismiss.

### C. AT & T's Motion to Intervene

■ AT & T has filed a motion to intervene in the present matter. Rule 24(b) of the Federal Rules of Civil Procedure grants the court authority to permit a party to intervene in an action.[9] The decision to permit intervention is within the court's discretion. *Getty Oil Co. v. Department of Energy,* 117 F.R.D. 540, 549 (D.Del.1987). The central consideration for the exercise of discretion is whether allowing intervention will cause delay or prejudice. *Id.*

AT & T asserts that it currently bills for and is entitled to collect reciprocal compensation from BA–Del for termination of ISP-bound traffic in Delaware. Its interests will be affected by the legal issues resolved in the present matter. It has filed its motion and its briefing in a timely fashion. It appears that AT & T's intervention in the matter will not cause prejudice to the parties. The court will therefore grant AT & T's motion to intervene.

### D. Legality of the PSC's Decision

#### 1. Standard of Review

■ The Telecommunications Act does not articulate the legal standard that federal courts should apply when reviewing the decision of a state commission. When Congress provides for review of an administrative proceeding, without setting forth the standard to be used or the procedures to be followed, review is confined to the administrative record. *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). In disputes related to interconnection agreements under 47 U.S.C. § 252, several courts have similarly concluded that the record created by the state utility commission is closed for the purpose of review. *See, e.g., Illinois Bell Telephone Co. v. WorldCom Technologies, Inc.,* 1998 WL 419493, at *2 (N.D.Ill. July 23, 1998); *US West Communications, Inc. v. AT & T Communications,* 31 F.Supp.2d 839, 843 (D.Or.1998). This court agrees.

■ The court has jurisdiction to review the actions of the PSC to determine whether they are in compliance with sections 251 and 252 of the Telecommunications Act and the implementing regulations thereof. 47 U.S.C. § 252(e)(6); *US West Communications v. MFS Intelenet,* 193 F.3d 1112, 1117 (9th Cir.1999). The court reviews questions of law de novo. *US West,* 193 F.3d at 1117; *US West Communications, Inc. v. Hix,* 986 F.Supp. 13, 19 (D.Colo.1997). All other issues are reviewed according to an arbitrary and capricious standard. *US West,* 193 F.3d at 1117; *US West,* 31 F.Supp.2d at 843; *Hix,* 986 F.Supp. at 19.

#### 2. Termination Date

■ BA–Del asserts that the PSC violated federal law by setting a termination date of December 31, 1999 in the interconnection agreement between GNAPs and BA–Del. BA–Del notes that GNAPs opted into an existing agreement between MFS and BA–Del which provided for a termination date of July 1, 1999. BA–Del contends that federal law requires that the termination date of the original agreement

---

**9.** Rule 24(b) of the Federal Rules of Civil Procedure provides:

(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

must be maintained in the opt-in agreement, and that the PSC erred in extending the duration of the GNAPs agreement by six months.

### a. *Federal Law*

The Telecommunications Act provides that an incumbent local exchange carrier (ILEC) such as BA–Del must permit other carriers to "opt-in" to existing interconnection agreements. 47 U.S.C. § 252(i). The FCC has promulgated regulations according to this statute. *First Report and Order, Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Red 15499 (1996), modified on recon., 11 FCC Red 13042 (1996) (*"Local Interconnection Order"*). The FCC therein recognized that interconnection agreements are time-sensitive contracts, and that it would be unfair to extend the terms of an existing agreement beyond the time frame agreed upon by the original parties. *See id.* ¶ 1319. The FCC, in resolving a case brought by GNAPS in a Virginia dispute, expressly rejected GNAPs' suggestion that termination dates of existing agreements can be modified for the purposes of § 252(i) opt-in agreements. *See In re Global NAPs South, Inc. Petition for Preemption of Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Dispute with Bell–Altantic–Virginia, Inc.*, CC Docket No. 99–108, ¶ 8, 1999 FCC LEXIS 3729 (rel. Aug. 5, 1999) (*"FCC GNAPs Ruling"*). The FCC explained that a carrier opting into an existing agreement takes all the terms and conditions of that agreement "including its original expiration date." *Id.*

The FCC recognized the risk that ILECs could frustrate the purpose of the opt-in provisions by delaying negotiations with requesting carriers. In response, the FCC provided for expedited opt-in procedures. *See Local Interconnection Order* ¶ 1321. A requesting party may invoke these procedures, by which the FCC preempts the jurisdiction of the state regulatory commission and oversees the opt-in negotiations. *See id.* The FCC also authorized state regulatory commissions to establish their own expedited opt-in procedures. *See id.*

The FCC has imposed a number of limits on the rights of requesting carriers to opt into existing interconnection agreements. These limitations include the rule that ILECs need only permit requesting carriers to exercise opt-in rights "for a reasonable amount of time." 47 C.F.R. § 51.809. The FCC has not provided guidance as to what constitutes a "reasonable amount of time." The Public Service Commission of the State of Maryland, however, rejected GNAPs' suggestion that it was reasonable to opt-into a three-year agreement between Bell Atlantic and MFS approximately two and a half years after its approval. *In re Petition of Global NAPs South, Inc. for Arbitration of Interconnection Rates, Terms and Conditions and Related Relief*, Case No. 8731, at 5 (Md. PSC July 15, 1999) (*"Maryland Ruling"*).

### b. *The Delaware Arbitration*

The arbitrator for the State of Delaware acknowledged that it would be improper to allow GNAPs to opt into the MFS agreement and to retain a three-year contract duration. *See Arbitration Award, Petition of Global NAPs South, Inc. for the Arbitration of Unresolved Issues from the Interconnection Negotiations with Bell Atlantic–Delaware, Inc.*, Docket No. 98–540, ¶ 32 (Del. PSC Mar. 9, 1999). It would be unreasonable, the arbitrator stated, to grant requesting parties the ability to extend the terms of existing interconnection agreements beyond the termination date stipulated to by the parties to the original agreement. *See id.* Ordinarily, he wrote, "an opted into agreement will expire when the original interconnection agreement expires." *Id.*

The arbitrator ruled that an exception from this general rule is warranted in this case. BA–Del allegedly stonewalled

GNAPs by opposing its attempt to opt into the MFS agreement. The arbitrator stated that BA–Del had raised the same arguments against GNAPs as it had previously and unsuccessfully asserted against another requesting carrier, Focal Communications. In spite of BA–Del's experience in the Focal litigation, it pursued its claims against GNAPs for six months, thereby reducing the amount of time remaining before the termination date of the MFS agreement. The arbitrator reasoned that it would be unfair to hold GNAPs to the original termination date in light of BA–Del's alleged delay tactics. Accordingly, the arbitrator recommended to the PSC that the Commission extend the expiration date of GNAPs' opted-into agreement by six months, until December 31, 1999. *See id.* ¶ 35.

The PSC issued an order on June 22, 1999 that largely adopted the findings and recommendations of the arbitrator. *Order No. 5092, Application of Global NAPs South, Inc., for the Arbitration of Unresolved Issues from the Interconnection Negotiations with Bell Atlantic–Delaware,* Case No. 98–540 (Del. PSC June 22, 1999). The PSC therein summarized the arbitrator's conclusion that BA–Del had "unfairly and unreasonably dragged its feet," and that it would be "inequitable to require GNAPs to bear the loss associated with this undue delay." *Id.* at 13. Stating that an arbitrator may afford relief of an equitable nature, the PSC adopted the arbitrator's recommendation.

GNAPs first sought to opt into the MFS agreement in September 1998. The three-year agreement between MFS and BA–Del recites a termination date of July 1, 1999. Given these dates, GNAPs would have had, at best, less than ten months remaining in the opted-into agreement. The Maryland commission, in a GNAPs dispute essentially identical to this one, found that it would be unreasonable to permit GNAPs to opt into the agreement at such a late date. *Maryland Ruling* at 5. The Delaware PSC ruled that it was not

unreasonable. This court does not contest the PSC's determination that it was reasonable for GNAPs to seek to opt into the MFS agreement with less than ten months remaining in the contract. The PSC, not the district court, is the entity chosen by Congress to arbitrate these interconnection agreements. It is "neither desirable nor practical for this court to sit as a surrogate public utilities commission to second-guess the decisions made by the state agency to which Congress has committed primary responsibility for implementing the Act." *US West,* 31 F.Supp.2d at 843.

The FCC granted the state commissions discretion with respect to the time at which requesting carriers may opt into existing agreements. The FCC did not offer any such discretion with respect to modifying the termination date of the agreements. In explicit language directed to GNAPs in litigation arising out of Virginia, the FCC stated that "the carrier opting into an existing agreement takes all the terms and conditions of that agreement ... *including its original expiration date.*" *FCC GNAPs Ruling* ¶ 8 (emphasis added). Although the PSC has the authority to impose "appropriate conditions to implement federal law," 47 U.S.C. § 252(b)(4), the PSC does not have the authority to impose terms that extend beyond what is permitted by federal law.

Where time is of the essence, federal law provides procedures by which requesting carriers, such as GNAPs, can obtain expedited review of their applications. *See Local Interconnection Order* ¶ 1321. GNAPs was free to pursue such expedited procedures either in the Delaware PSC or in the FCC. *See id.* Federal law, however, does not permit the PSC to relieve a requesting carrier of such time pressures by extending the termination date of the opted into agreement. *See FCC GNAPs Ruling* ¶ 8.

This court has jurisdiction to review the decision of the PSC to determine if it meets the requirements of sections 251

and 252 of the Telecommunications Act. 47 U.S.C. § 252(e)(6). The court applies a de novo standard of review for questions of law. *US West*, 193 F.3d at 1117. Federal law requires that the opted-into agreement have a termination date of July 1, 1999. *FCC GNAPs Ruling* ¶ 8. The PSC departed from this rule and extended the termination date of the opted into agreement to December 31, 1999. The court rules that the PSC violated federal law in so doing, and that the original termination date of July 1, 1999 must apply.

The interconnection agreement, under the court's present ruling, expired over four months ago. It appears from the briefing that GNAPs has not yet exercised its rights under the interconnection agreement. If so, then it seems that BA–Del has incurred no damages from the error of the PSC. The court believes that the present ruling on the termination date moots the remaining issues related to whether the PSC imposed proper conditions in the interconnection agreement. If the parties believe that a case or controversy remains, they may file motions for further relief.

This court will issue an order declaring that the PSC's decision in its Order No. 5092 of May 11, 1999 is invalid insofar as it extends the termination date of the interconnection agreement recited therein until December 31, 1999; and enjoining the PSC from enforcing Order No. 5092 insofar as it recites a termination date of December 31, 1999.