**MCI TELECOMMUNICATIONS CORPORATION, a Delaware Corporation, and MCImetro Access Transmission Services, Inc., a Delaware Corporation, Plaintiffs,**

v.

**NEW YORK TELEPHONE COMPANY d/b/a Bell Atlantic–New York, a New York Corporation; the New York Public Service Commission; and John F. O'Mara, Thomas J. Dunleavy, Maureen O. Helmer, and James D. Bennett in their official capacities as members of the New York Public Service Commission, Defendants.**

**UNITED STATES of America, Intervenor.**

**No. 97–CV–1600(LEK/RWS).**

United States District Court, N.D. New York.

March 7, 2001.

491

Michael Whiteman, Whiteman, Osterman Law Firm, Albany, NY, Donald B Verrilli, Jr., D. Scott Barash, Daniel Mach, Jenner, Block Law Firm, Washington, DC,

D. Scott Bassinson, Office of Attorney General, State of New York, Environmental Bureau, Albany, NY, for MCI Telecommunications Corporation, Mcimetro Access Transmission Services, Inc.

John T. Mitchell Tobin, Dempf Law Firm Albany, NY Randal S. Milch, Bell Atlantic-New York, Legal Department, New York City, for New York Telephone Co.

Jonathan D. Feinberg, New York State Public Service Commission Albany, NY, for New York Public Service Commission, John O'Mara, Thomas J. Dunleavy, Maureen O. Helmer, James D. Bennett.

## MEMORANDUM—DECISION AND ORDER

KAHN, District Judge.

Presently before the Court is a motion for summary judgment by plaintiffs MCI Telecommunications Corporation and MCIMetro Access Transmission Services, Inc. (collectively "MCI"), a motion for summary judgment by defendant New York Telephone Company d/b/a Bell Atlantic–New York ("Bell–Atlantic"), a motion for summary judgment by defendants the New York State Public Service Commission, John F. O'Mara, Thomas J. Dunleavy, Maureen O. Helmer, and James D. Bennett (collectively "Public Service Commission"), and a cross-motion for summary judgment by defendant Public Service Commission based upon its affirmative defenses. For the following reasons MCI's motion is DENIED in part and held in ABEYANCE in part, Bell–Atlantic's cross motion is DENIED, and the Public Service Commission's motion is GRANTED in part and held in ABEYANCE in part, and its cross motion based upon its affirmative defenses is DENIED.

## I. BACKGROUND

### A. *Statutory Background*

The current set of summary judgment motions arise out of Congress' enactment of the Telecommunications Act of 1996 ("the Act" or "the 1996 Act"). *See* 47 U.S.C. §§ 251–261. Congress enacted the 1996 Act, in part, to stimulate competition in the market for local telephone service. *See* H.R.Rep. No. 104–204 at 89 (1995); *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Prior to the 1996 Act, local telephone service throughout the country was typically considered a natural monopoly. *See AT & T Corp.*, 525 U.S. at 371, 119 S.Ct. 721.

This natural monopoly existed because states typically granted exclusive franchises in each local service area to local exchange carriers ("LECs" or "LEC"), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that make up a local exchange network. *See id.* To end this monopoly, the Act prohibited states from enforcing laws that impede competition in the local phone service market and placed a variety of duties on incumbent LECs designed to induce new entrants to enter the local phone service market. *See id.* Among other things, the Act required LECs to share their network with competitor local exchange carriers ("CLECs or CLEC"). *See* 47 U.S.C. § 251(c)(2).

When a CLEC seeks to gain access to the LEC's existing network, the LEC and CLEC have the option of negotiating access without regard to the duties imposed on the LEC by the Act. *See* 47 U.S.C. § 252(a)(1); *AT & T Corp.*, 525 U.S. at 371–72, 119 S.Ct. 721. If, however, negotiations between the LEC and CLEC fail, either party can petition the state commis-

sion that regulates local phone service, in this case the New York State Public Service Commission, to arbitrate disputed matters and issue an agreement between the LEC and CLEC that incorporates both the parties' negotiated terms and the commission's adjudicated terms. *See* 47 U.S.C. § 252(c). In any case where a state commission makes a determination regarding disputed issues between an LEC and CLEC, either party may challenge that decision "in an appropriate Federal district court to determine whether the agreement [issued] meets the requirements" of the 1996 Act. 47 U.S.C. § 252(e)(6).

In the instant suit, MCI, the CLEC, and Bell–Atlantic, the LEC, conducted lengthy voluntary negotiations designed to allow MCI competitive access to Bell–Atlantic's network. After these negotiations failed, MCI filed a compulsory arbitration petition pursuant to 47 U.S.C. § 252(b) and a petition for mediation of various technical issues with the New York State Public Service Commission. Upon the New York State Public Service Commission's resolution of the various outstanding matters between MCI and Bell–Atlantic and issuance of an interconnection agreement (the "Interconnection Agreement") incorporating its arbitration and mediation decisions, both parties appealed to this Court pursuant to 47 U.S.C § 252(e)(6).

### B. *Proceedings Before the New York State Public Service Commission*

MCI and Bell–Atlantic–specific arbitration proceedings were conducted before Administrative Law Judge Eleanor Stein from August 26, 1996, the date of MCI's petitions, until October 1, 1997, the date that the New York State Public Service Commission approved the executed Interconnection Agreement between MCI and Bell–Atlantic incorporating Judge Stein's

rulings.[1] While the MCI and Bell–Atlantic–specific arbitration proceedings were proceeding before Judge Stein, the New York State Public Service Commission also conducted proceedings before Administrative Law Judge Joel A. Linsider (the "Linsider Proceedings") designed to set permanent rates for all new entrants into the local telephone service provider market.

■ Judge Linsider's findings were ultimately incorporated into Judge Stein's rulings. MCI's and Bell–Atlantic's summary judgment papers challenge portions of both Judge Stein's and Judge Linsider's rulings and argue that they violate various provisions of the 1996 Act. The Public Service Commission's motion and cross motion both argue that MCI's and Bell–Atlantic's challenges to its rulings have no merit and, in any event, that the Eleventh and Tenth Amendment of the United States Constitution divest this Court of jurisdiction from adjudicating the merits of MCI's and Bell–Atlantic's claims.[2] The Court will address each of these arguments in turn.

## II. DISCUSSION

### A. *Standard for Dismissal for Lack of Subject Matter Jurisdiction*

A court may dismiss a case for lack of subject matter jurisdiction under Fed. R.Civ.P. 12(b)(1) when it lacks the constitutional or statutory power to adjudicate the case. *See* Fed R. Civ. P. 12(b)(1). In fact, because federal courts are courts of limited jurisdiction and can adjudicate "only those cases within the bounds of Article III of the United States Constitution and Congressional enactments stemming therefrom," *Walsh v. McGee,* 899 F.Supp. 1232, 1236 (S.D.N.Y.1995), whenever "it appears by suggestion of the parties or otherwise" that this Court lacks jurisdiction of the subject matter it must affirmatively dismiss the action, Fed. R.Civ.P. 12(h)(3).

■ As such, the burden of proving that a federal court has subject matter jurisdiction over an action rests upon the party attempting to invoke the court's jurisdiction, *see Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942), and no presumption of truth attaches to the non-moving party's allegations, *see Brown v. American Legion Cortland City Post,* 64 F.Supp.2d 96, 97 (N.D.N.Y.1999). Moreover, because a dismissal under Fed R. Civ. P. 12(b)(1) is not a dismissal on the merits and is without res judicata effect on the underlying merits of the claims, when a court dismisses a case pursuant to 12(b)(1) it is precluded from exercising supplemental jurisdiction over related state claims. *See Cushing v. Moore,* 970 F.2d 1103, 1106 (2d Cir.1992).

1. The New York State Public Service Commission approved the submitted interconnection agreement on this date and rejected portions of it, requiring the parties to submit their final contract on October 10, 1997. The contract's initial term was for three years but, pursuant to an automatic renewal clause, it continues to bind the parties. Because the parties are bound by the terms of the original agreement pursuant to its automatic renewal clause, the issues raised in the initial complaint relating to its validity are ripe for adjudication and this Court's decision does not present any Article III "case and controversy" problems.

2. In its moving papers, the Public Service Commission states that it seeks summary judgment under Fed.R.Civ.P. 56(c) on this ground. The Court notes that a motion to dismiss on the basis of sovereign immunity is, in reality, a motion to dismiss based on lack of subject matter jurisdiction and proceeds under Fed.R.Civ.P. 12(b)(1). *See Michigan Bell Tel. Co. v. MFS Intelenet,* 16 F.Supp.2d 817, 822 (W.D.Mich.1998). As such the Court will treat the Public Service Commission's arguments pertaining to sovereign immunity as a request to dismiss MCI's and Bell–Atlantic's complaints pursuant to Fed. R.Civ.P. 12(b)(1).

### 1. Public Service Commission's Eleventh Amendment Claim

#### a. State Sovereign Immunity Generally

 The Eleventh Amendment to the United States Constitution declares that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. It has been interpreted to prevent federal courts from exercising jurisdiction over suits brought by citizens of a state against the state or the state's agencies. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy,* 506 U.S. 139, 144, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Edelman v. Jordan,* 415 U.S. 651, 652–53, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 10–11, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Additionally, when a state is not named explicitly in a suit but is the real party in interest, the Eleventh Amendment bars a federal court from exercising jurisdiction over the suit. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Finally, the Eleventh Amendment bars Congress from utilizing its Article I powers, and in particular the Commerce Clause, to abrogate a state's sovereign immunity. *See Seminole Tribe v. Florida,* 517 U.S. 44, 72, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

 Eleventh Amendment immunity is, however, subject to limitations. *See College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). For example, Congress may authorize a private party to sue a nonconsenting state in federal court pursuant to its powers to enforce the Fourteenth Amendment. *See Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 80, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *College Savings Bank,* 527 U.S. at 670, 119 S.Ct. 2219. A state may also consent to suit and thereby subject itself to the jurisdiction of a federal court. *See Clark v. Barnard,* 108 U.S. 436, 447–48, 2 S.Ct. 878, 27 L.Ed. 780 (1883). Additionally, a party may sue state officials in their individual capacity in federal court for prospective injunctive relief to stop the state official from violating federal law. *See Ex parte Young,* 209 U.S. 123, 156, 28 S.Ct. 441, 52 L.Ed. 714 (1908)

#### b. Waiver of Sovereign Immunity

 The Public Service Commission argues that the Eleventh Amendment bars a telecommunications carrier from utilizing 47 U.S.C. § 252(e)(6) to bring suit against it in federal district court. Specifically, the Public Service Commission argues that, because the Telecommunications Act of 1996 was passed pursuant to Congress' powers under the Commerce Clause, Congress lacked the power to abrogate its sovereign immunity. *See* U.S. Const. art I, § 8, cl. 3; *see also* U.S. Const. amend XI. Moreover, the Public Service Commission asserts that it did not voluntary waive its sovereign immunity. In response, the United States of America, MCI, and Bell–Atlantic argue that the Public Service Commission waived its Eleventh Amendment immunity because it voluntarily accepted and performed its assigned role under the 1996 Act.

The Court disagrees with the Public Service Commission's argument that it did not waive its sovereign immunity by arbitrating the MCI and Bell–Atlantic dispute. Supreme Court jurisprudence has "long recognized that a State's sovereign immunity is a personal privilege which it may waive at [its] pleasure." *College Sav. Bank,* 527 U.S. at 675, 119 S.Ct. 2219 (quoting *Clark,* 108 U.S. at 447, , 2 S.Ct. 878). Generally, a court will conclude that a state has waived its sovereign immunity

if the state voluntarily invokes its jurisdiction, *See Gunter v. Atlantic Coast Line R.R. Co.*, 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906). Alternatively, waiver will be found if the state clearly declares that it intends to submit itself to the court's jurisdiction. *See College Sav. Bank*, 527 U.S. at 675–76, 119 S.Ct. 2219 (quoting *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 54, 64 S.Ct. 873, 88 L.Ed. 1121 (1944)).

Recently, the Supreme Court overruled as "ill conceived" the notion that a state can constructively waive its sovereign immunity by its "mere presence in a field subject to congressional regulation." *See College Sav. Bank*, 527 U.S. at 680, 119 S.Ct. 2219. Ruling that such participation is "very far from concluding that the State made an 'altogether voluntary' decision to waive its immunity" the Court concluded that a state waives its sovereign immunity by engaging in activity subject to congressional regulation if (1) Congress clearly and unambiguously puts the state on notice that the state's conduct subjects it to federal suits brought by individuals; (2) the state may refuse from participating in the particular activity without otherwise excluding itself from conduct that is lawfully within its powers; and (3) the state elects to engage in the conduct after it receives notice that such conduct subjects it to suit. *Id.* at 675–87, 119 S.Ct. 2219; *see also, AT&T Comms. v. BellSouth Telecomms.*, 238 F.3d 636, 644 (5th Cir.2001).

Although no court in this Circuit has addressed the issue of whether a state commission waives its sovereign immunity by arbitrating disputes under the 1996 Act, at least 14 district courts and three of the four circuit courts to address this issue have concluded that a state commission's participation in the arbitration scheme established under the Act effectuates a non-verbal voluntary waiver of the state commission's Eleventh Amendment immunity under *College Savings Bank. See AT & T Comms.*, 238 F.3d at 645; *MCI Telecomms. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 344 (7th Cir.2000); *MCI Telecomms. Corp. v. Public Serv. Comm'n*, 216 F.3d 929, 939 (10th Cir.2000); *Bell Atlantic–Pennsylvania, Inc. v. Pennsylvania Pub. Util. Comm'n*, 107 F.Supp.2d 653, 662 (E.D.Pa.2000); *Bell Atlantic–Delaware, Inc. v. McMahon*, 80 F.Supp.2d 218, 233 (D.Del.2000); *Bell Atlantic–Delaware, Inc. v. Global Naps South*, 77 F.Supp.2d 492, 500 (D.Del.1999); *AT&T Comms. of Southwest, Inc. v. Southwestern Bell Tel. Co.*, 86 F.Supp.2d 932, 947 (W.D.Mo.1999) (rev'd, in part, on other grounds); *Indiana Bell Tel. Co. v. Smithville Tel. Co., Inc.*, 31 F.Supp.2d 628, 637 (S.D.Ind.1998); *Michigan Bell Tel. Co.*, 16 F.Supp.2d at 825; *MCI Telecomms. Corp. v. BellSouth Telecomms., Inc.*, 9 F.Supp.2d 766, 770 (E.D.Ky.1998); *Indiana Bell Tel. Co., Inc. v. McCarty*, 30 F.Supp.2d 1100, 1106 (S.D.Ind.1998); *MCI Telecomms. Corp. v. Illinois Bel Tel. Co.*, No. 97 CV 2225, 1998 WL 156678, at *7 (N.D.Ill. Mar.31, 1998); *AT&T Comms., Inc. v. Michigan Bell Tel. Co.*, 60 F.Supp.2d 636, 641 (E.D.Mich. 1998); *US West Comms., Inc. v. MFS Intelenet, Inc.*, 35 F.Supp.2d 1221, 1230 (D.Or.1998); *US West Comms., Inc. v. TCG Oregon*, 35 F.Supp.2d 1237, 1245 (D.Or.1998); *BellSouth Telecomms., Inc. v. Tennessee Regulatory Auth.*, No. 3:97–0523, 1998 WL 1109434, at *8 (M.D.Tenn. Jan.27, 1998); *US West Comms., Inc. v. Public Serv. Comm'n of Utah*, 991 F.Supp. 1299, 1302 (D.Utah 1998).

The underlying rationale for each of these opinions is that the Act does not mandate that a state commission participate in the arbitration process. If a state chooses not to participate in the Act, the Federal Communications Commission ("FCC") assumes the role of the state commission. *See* 47 U.S.C. § 252(e)(5). However, if a state does choose to participate, the Act expressly provides that any

aggrieved party to a state commission's determination may bring suit in an appropriate Federal district court. *See* 47 U.S.C. § 252(e)(6).

The one circuit to conclude otherwise rested its decision on the fact that constructive waivers of sovereign immunity are disfavored and that Congress was not "unmistakably clear and unequivocal in its intent" to condition a states' participation in the 1996 Act's regulatory scheme as a waiver of its immunity. *Bell Atlantic Maryland Inc. v. MCI Worldcom, Inc.,* 240 F.3d 279, 291 (4th Cir.2001). The Fourth Circuit's decision ignored the fact that *College Savings Bank* did not absolutely prohibit courts from concluding that a state's voluntary participation in a regulatory scheme may sometimes effectuate a waiver of that state's sovereign immunity. Instead, the Fourth Circuit's opinion reduced the first prong of the three prong waiver test expressed in *College Savings Bank* to a cursory examination of whether the 1996 Act invoked the words "State[s] shall not be immune under the Eleventh Amendment ... from suit in Federal Court." *Bell Atlantic Maryland, Inc.,* 240 F.3d at 291.

Not only does such a reading of *College Savings Bank* and the Eleventh Amendment destroy the underlying purpose of the 1996 Act, it creates an untenable distinction whereby the waiver language contained in 47 U.S.C. § 252(e)(6) stating that an aggrieved party may challenge a decision of the state commission "in an appropriate Federal district court" somehow fails to put States on notice that their choice to arbitrate disputes under the Act subjects them to suit in federal district court. 47 U.S.C. § 252(e)(6). In compari-

son, when Congress declares, in a statute like 42 U.S.C. § 2000d–7(a)(1), that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court," a state is placed on notice that its sovereign immunity is waived even though the waiver language of both 47 U.S.C. § 252(e)(6) and 42 U.S.C. § 2000d–7(a)(1) unambiguously purport to subject states to suit in federal court. *See* 42 U.S.C. § 2000d–7(a)(1); *see also Bell Atlantic Maryland, Inc.* 240 F.3d at 291.

Resting a sovereign immunity waiver decision on this kind of technicality without examining the statute in context eviscerates Congress' ability to cope with the delicate and complex task of promoting increased competition in the local telephone service provider market. As Justice Scalia noted when examining the 1996 Act in *AT & T Corp. v. Iowa Utilities Bd.,* "if the federal courts believe a state commission is not regulating in accordance with federal policy they may bring it to heel." *Iowa Utilities Bd.,* 525 U.S. at 379 n. 6, 119 S.Ct. 721. This Court's decision to follow the majority of other Courts that have addressed this issue allows it do just that—bring the Public Service Commission to heel if it does not regulate in accordance with the federal policies expressed by the 1996 Act.

■ Accordingly, this Court holds that Congress clearly and unambiguously put the Public Service Commission on notice that participation in the Act's arbitration scheme subjected it to federal suit. The Public Service Commission could have refused to participate in the Act without otherwise excluding itself from conduct lawfully within its powers.[3] Despite this

---

**3.** The Public Service Commission's argument that New York State legislation requires it to regulate telecommunications matters within the state and therefore compelled it to participate in the Act underscores the very fact that

New York waived its sovereign immunity for claims arising under 47 U.S.C. § 252(e)(6). The 1996 Act, with unmistakable clarity, declares that "[i]n any case in which a State commission makes a determination under this

fact, the Public Service Commission chose to participate in the arbitration process established under the Act. As a result, the Public Service Commission waived its Eleventh Amendment immunity as to arbitration determinations made pursuant to the 1996 Act. Consequently, the Court denies the Public Service Commission's cross-motion to dismiss for lack of jurisdiction based upon sovereign immunity.[4]

### 2. Public Service Commission's Tenth Amendment Claim

#### a. Tenth Amendment Generally

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the state respectively, or to the people." U.S. Const. amend. X. It assures that the system of dual sovereignty inherent in the constitutional structure remains intact "by reserving to the states or the people the powers not delegated by the Constitution to the United States." *Petersburg Cellular v. Board of Supervisors of Nottoway*, 205 F.3d 688, 700 (4th Cir.2000)(citing *Printz v. United States*, 521 U.S. 898, 918–19, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997)). Accordingly, the "Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

#### b. Tenth Amendment's Application to the Arbitration Provisions of the 1996 Act

The Public Service Commission's Tenth Amendment argument rests upon the premise that the 1996 Act compels it to implement a federal program in violation of its inherent right to remain independent and sovereign from the federal government. *See, e.g., Printz*, 521 U.S. at 924–25, 117 S.Ct. 2365. In essence, the Public Service Commission asserts that the Act requires it to function as a "bureaucratic

---

section, any party aggrieved ... may bring an action in an appropriate Federal district court to determine whether the Agreement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6). The New York State Legislature, fully cognizant of this provision, still mandated that the Public Service Commission arbitrate matters arising under the 1996 Act. Thus, the New York State Legislature voluntary waived the Public Service Commission's immunity for claims arising under 47 U.S.C. § 252(e)(6) by not allowing it to opt out of the voluntary arbitration duties contained in the 1996 Act even if the Public Service Commission did not waive its sovereign immunity itself.

4. Assuming arguendo that the State has not waived its sovereign immunity, the Court notes that the *Ex Parte Young* doctrine authorizes MCI's and Bell–Atlantic's claims to proceed against the individual commissioners named in the instant suit. The Supreme Court recently cautioned that, "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex Parte Young*." *Seminole Tribe*, 517 U.S. at 54, 116 S.Ct. 1114. In the instant case, there is no such detailed remedial scheme to foreclose application of the *Ex Parte Young* doctrine, and in fact, the one Circuit that did not address whether the Act effectuates a non-verbal waiver of a state's sovereign immunity concluded, nevertheless, that *Ex Parte Young* provides a basis for federal courts to assume jurisdiction over claims asserted against a state under 47 U.S.C. § 252(e)(6). *See Telespectrum v. Public Serv. Comm'n*, 227 F.3d 414, 422 (6th Cir.2000). The Court finds the reasoning of the Sixth Circuit, as well as the three other Circuit Courts and countless other district courts to address this issue, persuasive and holds that under the *Ex Parte Young* doctrine, the Eleventh Amendment does not bar MCI's and Bell–Atlantic's claims from proceeding against the individual commissioners. *See, e.g., AT & T Comms.*, 238 F.3d 636, 649; *MCI Telecomms. Corp.*, 222 F.3d at 45; *MCI Telecomms. Corp.*, 216 F.3d at 940.

puppet of the Federal Government or to abandon regulation of an entire field traditionally reserved" to it. *Federal Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 783, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). The Court disagrees.

Congress simply offered the State, consistent with the Tenth Amendment, "the choice of regulating the activity according to federal standards or having state law pre-empted by federal regulation." *New York*, 505 U.S. at 167, 112 S.Ct. 2408. As Congress, pursuant to its inherent powers under the Commerce Clause, was well within its Constitutional right to preempt the Public Service Commission from regulating telecommunications matters that were traditionally reserved to it, the Act's arbitration provisions could not violate the Tenth Amendment. *See Cellular Phone Taskforce v. Federal Telecommunications Industry*, 205 F.3d 82, 96 (2d Cir.2000)(citing *City of New York v. Federal Comms. Comm'n*, 486 U.S. 57, 63–64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988); *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698–700, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984)). Moreover, the Act's arbitration provisions in no way commandeer the Public Service Commission, but, as already held, offers it or the State a voluntary choice to either participate in the scheme it establishes or reject any such participation. Under these circumstances, the Court concludes that the Tenth Amendment does not preclude it from exercising jurisdiction over MCI's and Bell–Atlantic's claims and now turns to the merits of those claims. *See Michigan Bell Tel. Co.*, 202 F.3d at 208; *see also MCI Telecomms.*, 9 F.Supp.2d at 772; *AT & T Comms.*, 60 F.Supp.2d at 640.

### D. *Standard and Scope of Review*

■ The 1996 Act does not provide a legal standard that federal courts should utilize when reviewing the decision of a state commission. *See Bell–Atlantic Dela-*

*ware*, 77 F.Supp.2d at 502. Under general administrative law principles, a court is usually confined to the administrative record when Congress does not set forth the standards or procedures for the Court to use when reviewing an administrative proceeding. *See id; see also United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). Following this guideline and the lead of other courts to address this issue, this Court agrees that it is limited to the record created by the state utility commission when reviewing disputes related to interconnection agreements issued under 47 U.S.C. § 252(e)(6). *See Bell–Atlantic Delaware*, 77 F.Supp.2d at 502; *Illinois Bell Telephone Co. v. WorldCom Techs., Inc.*, No. 98 C 1925, 1998 WL 419493, at *2 (N.D.Ill. July 23, 1998); *US West Comms., Inc.*, 31 F.Supp.2d at 843.

■ When evaluating the record, the Court reviews the Public Service Commission's findings of fact under the arbitrary and capricious standard. *See AT&T Comms. of Southwest, Inc.*, 86 F.Supp.2d at 944; *US West Comms., Inc. v. Hix*, 986 F.Supp. 13, 19 (D.Colo.1997). When applying the arbitrary and capricious standard, courts

consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted). In light of the highly technical and specific idiosyncracies in an incumbent carrier's local network, this highly deferential standard of review is particularly appropriate when reviewing findings of fact made by

an agency enforcing the 1996 Act. *See AT&T Comms. of the Southwest, Inc.*, 86 F.Supp.2d at 944.

Questions of law relating to an agency's interpretation of the 1996 Act are reviewed de-novo and are not entitled to the deference accorded federal agencies under the Supreme Court's holding in *Chevron U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The deference accorded federal agencies under *Chevron* is based upon the federal agency's expertise and familiarity "with the subject matter of its mandate and the need for coherent and uniform construction of a federal law nationwide." *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495–96 (9th Cir.1997) (quoting *Turner v. Perales*, 869 F.2d 140, 141 (2d Cir.1989)). Those considerations are not applicable to a state agency's interpretation of federal law. *See Turner*, 869 F.2d at 141.

### 1. MCI's Claims Against Bell Atlantic and the Public Service Commission [5]

#### a. The Public Service Commission's Setting of Switching Rates

▮▮▮ Under the 1996 Act, a state commission setting rates for a competitor's access to network elements from the incumbent LEC must set those rates in a just, reasonable, and non-discriminatory manner "based on the cost" of providing the network element. 47 U.S.C. §§ 251(c)(3), 252(d)(1). In rejecting, the Federal Communications Commission's interpretation of these provisions as mandating that rates be set on a forward looking basis approximating the incremental cost of providing the element at issue using the most efficient technology, the Eighth Circuit held that

> [a]t bottom, however, Congress has made it clear that it is the cost of providing the *actual* facilities and equipment that will be used by the competitor (and not some state of the art presently available technology ideally configured but neither deployed by the ILEC nor to be used by the competitor) which must be ascertained and determined.

*Iowa Utils. Bd. v. Federal Comms. Comm'n*, 219 F.3d 744, 751 (8th Cir.2000) (overruling, in part, *In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996*, First Report and Order, 11 F.C.C.R. 15499, ¶¶ 677–78, 85–89, 99–103 (1996) ("F.C.C. Implementation Ruling")) (emphasis added). As such, any Public Service Commission determination not based on the cost of providing the actual facilities and equipment used by the competitor violates the 1996 Act and is invalid.

MCI argues that the rates the Public Service Commission set for use of New York Telephone's switches [6] are not based on cost as required by 47 U.S.C. § 252(d)(1). In particular, MCI claims that the Public Service Commission failed to account for the fact that Bell–Atlantic received "mega discounts" from switch vendors in 1994. MCI alleges that the Public Service Commission accepted Bell–Atlantic's explanation that the discounts received resulted from the company's one-time, large-scale conversion from analog to digital switches without taking into ac-

---

**5.** As an initial matter the Court notes that MCI voluntarily dismissed counts one, two, four, six, seven, and nine from its complaint and asked the Court to hold in abeyance a decision on count five due to pending settlement discussions. Accordingly, the Court only addresses counts three and eight in this decision and holds in abeyance a decision on

count five for an unspecified period of time not to exceed two months from the date of this opinion or, in the alternative, until such time that the Court, on its own prerogative, decides to address it.

**6.** A switch is a large computer that directs a phone call to its intended destination.

count the fact that purchasers like Bell–Atlantic regularly receive large discounts off the list price of switching equipment. Thus, MCI believes that the Public Service Commission should have set access rates applicable to switching equipment in light of this one-time discount as it best reflects large scale discounts that Bell–Atlantic regularly receives when purchasing switching equipment.

In addition MCI alleges that the Public Service Commission compounded the switching rate problem by adopting rates for installation and power equipment ("loading factors") based on a percentage of the already inflated switching price. In response, Bell–Atlantic and the Public Service Commission counter that the mega-discounts that MCI would like to have incorporated into the switch rate fees were one-time deductions that Bell–Atlantic was not likely to receive again. They were therefore not costs, as specified by the 1996 Act, that the Public Service Commission was required to take into account when determining the proper switch rates to charge MCI. Furthermore, because the switch rates were proper, both Bell–Atlantic and the Public Service Commission argue that the loading factors, based on these rates, were proper as well.

This Court disagrees with MCI. Especially relevant is the fact that the Public Service Commission analyzed actual investment amounts for thirty three switches installed between 1993 and 1994. After averaging the installed switch investments, the Public Service Commission "adjusted that switch cost downward to reflect the declining per-line price of switches within the industry generally." *Opinion and Order Setting Rates for First Group of Network Elements*, Op. No. 97–2, Case Nos. 95–C–0657, 94–C–0095, and 97–C–1174, at 85 (N.Y.P.S.C. Apr. 1, 1997) ("Net-

work Element Opinion"). Such an approach, not only complies with the recently overturned F.C.C. Implementation Ruling but also complies with the Eighth Circuit's decision overturning that ruling.

As discussed, the Eighth Circuit requires state commissions to base their rate making decisions on the actual costs the incumbent local service provider incurred when establishing its network. *See Iowa Utils. Bd.*, 219 F.3d at 751. This does not, however, mean that a state commission must incorporate "historic" data or that it cannot use a forward looking methodology when making price determinations. Rather, price determinations made on forward-looking costs calculations cannot be based on the forward looking costs of an "idealized network," but must be based on the incremental costs that an incumbent local service provider actually incurs or will incur. *Southwestern Bell Tel. Co. v. Missouri Pub. Serv. Comm'n*, 236 F.3d 922, 924 (8th Cir.2001); *see also Iowa Utils. Bd.*, 219 F.3d at 752–53.

When making the determination not to include the large one-time discounts Bell–Atlantic received when switching from analog to digital switches, the Public Service Commission utilized actual switching cost data from Bell–Atlantic that it felt better reflected the cost of providing those switches. It did not rely on the hypothesized costs of an idealized switching network nor did it unreasonably fail to include these discounts into its cost model. *See AT&T Corp. v. Federal Comms. Comm'n*, 220 F.3d 607, 617 (D.C.Cir.2000). Under these circumstances, this Court cannot conclude that the Public Service Commission made an arbitrary and capricious factual determination by failing to incorporate into its switching rate model the one time discount Bell–Atlantic received when converting from analog to digital switches.[7]

**7.** Since the pricing model utilized did not

arbitrarily and capriciously fail to include the

Accordingly, MCI's motion for summary judgment on this point is denied and the Public Service Commission's motion on this point is granted.

b. MCI's Claim That the Public Service Commission Should not Have Granted Bell–Atlantic Reciprocal Access to its Poles, Ducts, Conduits, and Rights of Way

MCI also challenges a portion of the Interconnection Agreement that grants Bell–Atlantic reciprocal access to its poles, ducts, conduits, and rights of way.[8] Although, there is no doubt that incumbent local service providers like Bell–Atlantic must provide competitors like MCI with access to their poles, ducts, conduits, and rights-of-way, there is considerable controversy about whether competitors must make their poles, ducts, conduits, and rights-of-way accessible to the incumbent local provider. *See* 47 U.S.C. § 251(b)(4); *US West Comms., Inc. v. Hamilton,* 224 F.3d 1049, 1052 (9th Cir. 2000).

Under 47 U.S.C. § 224, utilities are required to provide any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it. *See* 47 U.S.C. § 224(f)(1). The definition of telecommunications carrier under 47 U.S.C. § 224(a)(5) does not include incumbent LECs. *See* 47 U.S.C. § 224(a)(5). Reading these provisions together appears to confirm that competitors are not required to provide incumbents with access rights to their poles, ducts, conduits, and rights-of-way. Consequently, MCI argues that the Public Service Commission exceeded its authority under the 1996 Act when it ordered MCI to provide Bell–Atlantic with reciprocal access to its poles, ducts, conduits, and rights-of-way.

The Court rejects MCI's construction of 47 U.S.C. § 224. Under 47 U.S.C. § 224(c)(1), States that regulate access to poles, ducts, conduits, and rights of way can preempt the access requirements found in 47 U.S.C. § 224(f)(1) as long as the State certifies to the Federal Communications Commission that, in so regulating such access, it has the authority to consider and does consider the interests of the subscribers of the services offered and the consumers of the utility. *See* 47 U.S.C. § 224(c). The Public Service Commission has long exercised its statutory right to regulate these access issues and has provided proper certification to the Federal Communications Commission stating that it regulates these matters. *See States that*

---

one-time discounts Bell–Atlantic received when changing from analog to digital switches, the Court concludes that the Public Service Commission's decision to adopt loading factors based on this model was also not arbitrary and capricious.

**8.** The Public Service Commission argues that MCI waived this claim by failing re-raise the issue before it when MCI sought rehearing on other arbitrated matters. Additionally, the Public Service Commission argues that MCI waived its right to assert this claim because it failed to file second petition with it raising this point during the Commission's proceeding considering the issue of attachment to utility poles, ducts, and conduits. The Court holds that MCI has not waived these claims as it was not on clear notice that the consequences of its failure place the matter before the Commission for reconsideration might result in forfeiture of its right to appeal. *See Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir. 1992) (citing *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985)); *see also Francis v. City of New York,* 235 F.3d 763, 768 (2d Cir.2000). Nothing in the Public Service Commission's rules nor the 1996 Act's requirements demand the exhaustion requirement the Commission calls for and the Court, in the interests of justice, will not impose one on MCI at this point. The Court therefore holds that the Public Service Commission's cross-motion for summary judgment based upon the affirmative defense of waiver is denied.

*have Certified that they Regulate Pole Attachments*, 7 F.C.C.R. 1498, 1498 (1992). As such, it is neither bound by the F.C.C. Implementation Ruling mandating that reciprocal access not be given to incumbent local service providers nor does its decision violate section 224 of the 1996 Act. This Court therefore affirms the Public Service Commission's decision to grant Bell–Atlantic reciprocal access to MCI's poles, ducts, conduits, and rights-of-way, denies MCI's summary judgment motion challenging this decision, and grants the Public Service Commission's summary judgment motion defending this decision.

ii. Bell–Atlantic's Cross–Claims Against MCI and the Public Service Commission

a. The Public Service Commission's Decision to Allow MCI Access to Bell–Atlantic's Property for the Collocation of Remote Switching Modules

 The 1996 Act mandates that incumbent local service providers "permit physical collocation of equipment necessary for interconnection or access to unbundled network elements." 47 U.S.C. § 251(c)(6). Relying on a subsequently overruled construction of 47 U.S.C. § 251(c)(6) promulgated by the Federal Communications Commission that equated the term "necessary" as synonymous, in part, with "useful," the Public Service Commission ordered Bell–Atlantic to provide MCI with access to its property for the collocation of remote switching modules ("RSMs"). *See Opinion and Order Resolving Arbitration Issues*, Op. No. 96–33, Case No. 96–C–0787, at 16–17 (N.Y.P.S.C. Dec. 23, 1996) ("Arbitration Order"); *see also GTE Service Corp. v. Federal Comms. Comm'n*, 205 F.3d 416, 424 (D.C.Cir.2000).[9] The principle issue Bell–Atlantic raises is whether the Public Commission's reliance on this overruled interpretation of 47 U.S.C. § 251(c)(6) can withstand scrutiny.

In overruling the Federal Communications Commission's interpretation of the term necessary in § 251(c)(6) as synonymous with used or useful, the District of

---

**9.** The Public Service Commission also argues that it relied upon N.Y. Pub. Serv. Law § 97(3) to order RSM collocation on Bell–Atlantic's property. Although it is possible that this law might justify the Commission's imposition of the RSM collocation rule on Bell–Atlantic, the administrative record before the Court indicates that the Commission relied strictly upon the Federal Communication's misinterpretation of the term "necessary" as "synonymous with 'used' or 'useful' for the purposes of interconnection or access to unbundled elements" to justify its RSM collocation order. *See* Arbitration Order, at 16–17. The Public Service Commission's argument that because provisions contained in the Interconnection Agreement declare that it complies with state law indicates that arbitrators relied upon state law when ordering RSM collocation is untenable in light of the language contained in the Arbitration Order mandating collocation.

Moreover, the Public Service Commission's assertion that *Seiko Co. v. United States*, 95 F.3d 1094, 1101 (Fed.Cir.1996), allows this Court to utilize state law to uphold the RSM collocation order even if the Public Service Commission did not rely upon it when issuing the order is inapposite. In that case, the Court concluded that even though the agency had not relied upon the statutory grounds it asserted during the pendency of its appeal, given the clarity in which the statute applied to the set of facts before it, stepping outside the normal rule prohibiting use of an alternate ground not contained in the record was warranted. *Id.* Here, although possible, it is far from clear that RSMs qualify as "through lines" under N.Y. Pub. Serv. Law § 97. Therefore, the Court is precluded from stepping outside the record to uphold the Public Service Commission's decision on the alternative state law grounds proposed. *See Spancrete Northeast, Inc. v. Occupational Safety and Health Review Comm'n*, 905 F.2d 589, 593 (2d Cir.1990). Accordingly, the Court denies the Public Service Commission's cross-motion for summary judgment based upon its state law defense.

Columbia Circuit held that the plain language of the statute "requires LECs to provide collocation of competitors' equipment that is directly related to and thus necessary, required, or indispensable to interconnections or access to unbundled network elements." *Id.* at 424 (internal quotations omitted). Anything more demands a better explanation and "makes no sense in light of what the statute itself says." *Id.* Since the Public Service Commission relied on a discredited construction of § 251(c)(6), it did not conduct a factual inquiry into whether RSMs are directly related to and thus necessary, required, or indispensable to interconnections or access to unbundled network elements nor did it provide any further explanation as to why collocation of RSMs might otherwise fall under § 251(c)(6).

On its face, the Public Service Commission's decision to utilize such a broad construction of the term "necessary" contained § 251(c)(6) violates that portion of the Act. This is especially true in light of the interpretation given it by the District of Columbia Circuit and the fact that normally, "[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 312–13, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). However, in addition to interpreting the 1996 Act, the District of Columbia Circuit also remanded to the Federal Communications Commission for further explanation the issue of whether collocation of equipment not directly related to, necessary, required, or indispensable to interconnections or access

to unbundled elements is allowable under § 251(c)(6).

Thus, this Court is left with two anomalies. First, factually, it is quite possible, contrary to Bell–Atlantic's assertion, that RSMs might be necessary, required, or indispensable to provide competitors with interconnections or access to unbundled elements. Second, even if RSM collocation is not necessary, required, or indispensable for interconnection or access to unbundled element access, the Public Service Commission's decision to allow such collocation might still fall under the protection of § 251(c)(6) when the Federal Communications Commission reinterprets it in light of the District of Columbia's remand. Given these uncertainties, and the fact that the Court is no position to conduct the factual inquiry necessary to definitively resolve whether collocation of RSMs is allowable under the newly enunciated § 251(c)(6) standards issued by the District of Columbia Circuit, both Bell–Atlantic's and the Public Service Commission's motions for summary judgment on this point is denied and the matter is remanded to the Public Service Commission to conduct further proceedings consistent with this opinion.[10]

■ Bell–Atlantic also alleges that the Public Service Commission's collocation decision effected an unconstitutional taking of its property without just compensation in violation of the Fifth Amendment. *See* U.S. Const. amend. V. A regulatory taking claim against a state is not ripe until (1) the state agency imposing the allegedly confiscatory regulation takes final action against the plaintiff's property and (2) the plaintiff has pursued all available remedies

10. When conducting these additional proceedings, the Public Service Commission is directed to conduct a factual inquiry to determine whether RSM collocation is necessary under § 251(c)(6) as interpreted in this opinion and the District of Columbia Circuit's decision. Alternatively, the Public Service Commission is cautioned that if it finds that RSM collocation is not necessary under § 251(c)(6) but nevertheless chooses to order it, a sufficient alternative explanation as to why RSM collocation is ordered should be placed in the record so this Court may determine the validity of any such order.

under state law. *See Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186–97, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *US West Comms. v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1126 (9th Cir.1999). Because the collocation rates approved in the Interconnection Agreement were based upon tariff rates existing at the time of the arbitration and were set on a temporary basis, "subject to refunds and reparations," Bell–Atlantic may receive retroactive compensation over the collocation period. Arbitration Order, at 18.

■ Thus, the Public Service Commission has not taken final action on the allegedly confiscatory taking and Bell–Atlantic's claim is not ripe. *See U.S. West Comms.,* 193 F.3d at 1126. Additionally, New York state law provides a remedy for takings that Bell–Atlantic must pursue before bringing an action under the Fifth Amendment in federal court. Accordingly, this Court dismisses Bell–Atlantic's takings claim without prejudice.

### b. The Public Service Commission's Decision to Require Bell–Atlantic to Restore MCI's Service

■ The 1996 Act requires an LEC to provide service to competitors "that is at least equal in quality to that provided by the [LEC] to itself or any subsidiary, affiliate or other party to which the carrier provides interconnection." 47 U.S.C. § 251(c)(2)(C). While the phrase "at least equal in quality" leaves open the possibility that incumbent LECs may agree to pro-vide interconnections that are superior in quality to that provided to itself and others, it establishes a "floor below which the quality of the interconnection may not go." *Iowa Utils. Bd. v. Federal Comms. Commission,* 120 F.3d 753, 812 (8th Cir.1997) (rev'd sub nom. on other grounds *AT & T Corp.,* 525 U.S. at 397, 119 S.Ct. 721). Consequently, it is not impermissible for the Public Service Commission to set quality guidelines that are superior to those that the incumbent LEC provides itself. Rather, the Public Service Commission has discretion to order an incumbent LEC to offer superior quality to competitors as long as any such order is non-discriminatory and otherwise complies with the terms of the 1996 Act.

Utilizing this portion of the statute, the Public Service Commission ordered Bell–Atlantic to restore MCI's service in the event of an emergency network outage within one hour except in the case of a force majeure event affecting an entire exchange. For non-emergency network outages occurring between 8 a.m. and 6 p.m., the Public Service Commission utilized a formula requiring Bell–Atlantic, in part, to restore, within four hours of referral, ninety percent of all outages requiring a technician's visit to the premises. For outages not requiring a technician's visit, the Public Service Commission ordered Bell–Atlantic to restore service within two hours of referral eight-five percent of the time.

Bell–Atlantic alleges that the Public Service Commission unlawfully provided preferential treatment to MCI in computing these service restoration requirements.[11]

---

**11.** As an initial matter, the Court does not conclude that Bell–Atlantic waived this claim when it failed to provide an alternative quality of service scheme in response to a request from the Public Service Commission. The alternative it provided, based upon the standards contained in 16 N.Y.C.R.R. § 603.12, was offered to the Public Service Commission at an earlier point in the arbitration proceeding and rejected. Consequently, the Court concludes that Bell–Atlantic is entitled to have this decision reviewed on the merits here and denies the Public Service Commission's cross-motion for summary judgment based on Bell–Atlantic's waiver of this claim. Furthermore, although Bell–Atlantic's pleadings arguably challenge only those portions of the arbitration decision relating to emergency outages and not the entire quality of service scheme

In particular, Bell–Atlantic points to the service restoration contained 16 N.Y.C.R.R. § 603.12. Under these regulations, Bell–Atlantic has to restore service, in part, within twenty four hours of notification of a particular problem. *See* 16 N.Y.C.R.R. § 603.12. Bell–Atlantic argues that since the Public Service Commission allegedly adopted these standards for all other competitors seeking access to its network, they should also apply to MCI.

This Court disagrees with Bell–Atlantic's assertion. Specifically, the Public Service Commission did not adopt the standards contained in 16 N.Y.C.R.R. § 603.12 for all other competitors seeking to remedy a service outage. *See Order Approving Interim Guidelines for Carrier–to–Carrier Performance Standards and Results,* Case No. 97–C–0139 (N.Y.P.S.C. Mar. 16, 1998). Rather, the Public Service Commission adopted the standards set forth in 16 N.Y.C.R.R. § 603.12 on an interim basis as part of a large scale study to determine if formal carrier-to-carrier to rules are needed. *See id.* at 1. The study itself declares that its carrier-to-carrier guidelines only apply during the data gathering portion of the proceeding and "are not meant to replace or supersede interconnection agreements among carriers." *Id.* Thus, any competitor that negotiated and arbitrated an interconnection agreement prior to the institution of the study is bound by that specific agreement's terms and any competitor negotiating an agreement during the term's study is required

to use the study's terms as a starting point for negotiation.

■ Notably, the initial Arbitration Order at issue in this case specifically held that the creation of industry-wide carrier standards would affect the quality of service provisions in the Bell–Atlantic and MCI interconnection agreement and supersede them. *See* Arbitration Order at 7. Given this result and the fact that no industry-wide quality of service standards, to this Court's knowledge, exist, the Court concludes that the quality of service provisions contained in the Bell–Atlantic and MCI interconnection agreement, negotiated prior to the start of the carrier-to-carrier study and containing different quality of service standards than the study's standards, does not violate the parity and non-discrimination requirements contained in 47 U.S.C. § 251(c).[12] As a result, the Court grants the Public Service Commission summary judgment on this point and denies Bell–Atlantic's motion for summary judgment.

### III. CONCLUSION

Accordingly, it is hereby

ORDERED that MCI's motion for summary judgment is DENIED in part and held in ABEYANCE in part; and it is further

ORDERED that Bell–Atlantic's motion for summary judgment is DENIED; and it is further

---

incorporated into the Interconnection Agreement, all parties have fully briefed the totality of this issue and the Court will exercise its discretion, in the interests of judicial economy, to address Bell–Atlantic's entire claim notwithstanding any defect in its pleadings.

12. The Court's decision assumes that the Public Service Commission has yet to finalize industry-wide carrier-to-carrier quality of service provisions. If such standards have been finalized and they differ from those provisions contained in the Bell–Atlantic and MCI Interconnection Agreement, the Public Service Commission is hereby directed to incorporate those provisions into the agreement.

ORDERED that Bell–Atlantic's Fifth Amendment claim is DISMISSED without prejudice; and it is further

ORDERED that the Public Service Commission's cross-motion for summary judgment based upon its affirmative defenses is DENIED; and it is further

ORDERED that the Public Service Commission's alternative motion for summary judgment is GRANTED in Part and held in ABEYANCE in part; and it is further

ORDERED that those portions of MCI's and the Public Service Commission's motions for summary judgment pertaining to Count Five of MCI's complaint (Dark Fiber) are held in ABEYANCE for an unspecified amount of time not to exceed two months from the date of this opinion or, in the alternative, until such time that the Court, on its own prerogative, concludes that a decision is warranted; and it is further

ORDERED that outstanding issues related to Bell–Atlantic's remote switching collocation claim are REMANDED to the Public Service Commission for additional proceedings consisted with the terms of this opinion; and it is further

ORDERED that the Clerk of the Court serve a copy of this Order on all parties by regular mail.

IT IS SO ORDERED.